*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ERIC FORRER, | ) | |
| | ) | Supreme Court No. S-17377 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-18-00699 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA and LUCINDA | ) | |
| MAHONEY, Commissioner of the | ) | |
| Alaska Department of Revenue in her | ) | |
| official capacity, | ) | |
| | ) | No. 7480 – September 4, 2020 |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Sitka, M. Jude Pate, Judge.

Appearances: Joseph W. Geldhof, Law Office of Joseph W. Geldhof, Juneau, for Appellant. Laura Fox, William E. Milks, and Mary Hunter Gramling, Assistant Attorneys General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

The issues we consider today are not new. The disastrous consequences of runaway state debt weighed heavily on the minds of the Alaska Constitutional

Convention's Delegates as they pooled their collective knowledge and expertise to ensure that the 49th State would not suffer financial missteps of generations past.[1]  As Delegate Barrie M. White aptly explained:

> [I]ncurring debt is different from most any other type of legislation in that it not only goes directly to the pocketbook of the people concerned, but all the people of the State, but also to the pocketbook of future generations and that is why . . . so many states, so many local political subdivisions, always require debt to be approved by the people.[2]

Having experienced the Great Depression firsthand,[3] the Delegates desired fiscal responsibility and public accountability; these principles reverberate throughout article IX of the Alaska Constitution.  The clearest expression of this collective intent is contained in section 8:  "*No state debt* shall be contracted unless authorized by law for capital improvements or . . . housing loans for veterans, and ratified by a majority of the qualified voters of the State who vote on the question."[4]  Through this provision, the Delegates sought to prohibit "state debt" of any kind without public approval, subject

---

[1]     *See, e.g.*, 4 Proceedings of the Alaska Constitutional Convention (PACC) 2424 (Jan. 17, 1956) (statement of Del. Seaborn J. Buckalew) ("Now the only reason that you have any limitations or restrictions on the legislature is to prevent the legislature from impairing the credit of the state.  You don't want to get a runaway legislature and deplete the treasury or obligate the people for something that they can't pay for."); 3 ALASKA STATEHOOD COMM., CONSTITUTIONAL STUDIES pt. IX, at 21-23 (1955) [hereinafter CONSTITUTIONAL STUDIES] (providing a brief history of debt limitations in state constitutions).

[2]     4 PACC 2434 (Jan. 17, 1956) (statement of Del. Barrie M. White).

[3]     *See* 1 PACC 441-42 (Nov. 30, 1955) (statement of Del. Victor C. Rivers) (detailing economic recovery efforts in Alaska after the Great Depression).

[4]     Alaska Const. art. IX, § 8 (emphasis added).

only to a small set of exceptions.[5]  Today we are called upon to reaffirm those basic principles.

Anticipating a shortfall of revenue from previously enacted tax incentives, the 30th Alaska State Legislature attempted to offset future fiscal unpredictability by authorizing a discounted buyback of tax credits financed by bonds without pledging the "full faith and credit" of the State.  Without a vote of the people, the legislature created a public corporation capable of borrowing up to $1 billion through the issuance of subject-to-appropriation bonds to purchase outstanding oil and gas exploration tax credits, with bondholders to be reimbursed solely at the discretion of future legislatures through appropriations to the new public corporation.  A taxpayer brought suit, alleging *inter alia* that the legislature violated the Alaska Constitution's state debt limitation.  The superior court granted the State's motion to dismiss, ruling that the legislation did not create "debt" for purposes of the constitutional limitation.  We reverse and hold that this financing scheme — even if unforeseeable in the mid-twentieth century — is the kind of constitutional "debt" that the framers sought to prohibit under article IX, section 8 of the Alaska Constitution.

## II.     FACTS AND PROCEEDINGS

### A.     History Of Constitutional Debt Limits

Unlike the federal constitution, many state constitutions contain limitations or prohibitions on the debt that state and local governments may incur.[6]  The origins of

---

[5]     Article IX, section 8 also contains exceptions for emergencies and for "redeeming indebtedness outstanding at the time this constitution becomes effective," neither of which is involved here.

[6]     Richard Briffault, *Foreword:  The Disfavored Constitution:  State Fiscal Limits and State Constitutional Law*, 34 RUTGERS L.J. 907, 908 & n.12 (2003).

state constitutional debt provisions can be found in the early nineteenth century.[7] Following the War of 1812, states sought to improve infrastructure for protection and to encourage westward expansion.[8] State constitutions adopted between 1830 and 1850 thus "encourage[d] internal improvements within the state," such as the construction of turnpikes, canals, and railroads.[9] Toward that end, many states sold bonds pledging their full faith and credit then loaned the proceeds to private corporations to carry out various construction projects.[10]

But states began incurring debt "almost without limit," growing their collective debt from $13 million in 1830 to $100 million in 1838.[11] The bubble eventually burst when it became clear that many corporations could not repay their loans to states and could not generate the projected revenue from their projects.[12] When the

---

[7] Susan P. Fino, *A Cure Worse than the Disease? Taxation and Finance Provisions in State Constitutions*, 34 RUTGERS L.J. 959, 965-66 (2003).

[8] *See Attorney Gen. v. Pingree*, 79 N.W. 814, 816 (Mich. 1899); Fino, *supra* note 7, at 965-66.

[9] *Pingree*, 79 N.W. at 816; *see also* Fino, *supra* note 7, at 965-66 (discussing internal improvements); Briffault, *supra* note 6, at 911 (same).

[10] Fino, *supra* note 7, at 967.

[11] *Pingree*, 79 N.W. at 816.

[12] Briffault, *supra* note 6, at 911; *see also Pingree*, 79 N.W. at 816 ("But now, that the great bubble of speculation and inflation was burst, it became plain to the comprehension of the dullest that some of the state projects were wild and chimerical, and they were abandoned altogether.").

nation was besieged by an economic crisis referred to as the Panic of 1837, some states repudiated their debts or defaulted on interest payments as a result.[13]

Before 1840 no state constitution contained a restriction on incurring state debt.[14] After the Panic of 1837 many states revised their constitutions to include restrictions on legislative discretion to create state debt.[15] But within a few decades the booming railway industry made legislatures eager to circumvent those constitutional debt restrictions.[16] The favored means of achieving this was to issue bonds through municipalities, but the economic crisis that followed led to more state constitutional revisions closing that loophole.[17] The next major device for circumventing state debt

---

[13] Briffault, *supra* note 6, at 911; *see also Lonegan v. State* (*Lonegan I*), 809 A.2d 91, 95-96 (N.J. 2002) (explaining the origins of New Jersey's Debt Limitation Clause from the Panic of 1837 and the economic crisis's impact on states).

[14] Stewart E. Sterk & Elizabeth S. Goldman, *Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations*, 1991 WIS. L. REV. 1301, 1309.

[15] Briffault, *supra* note 6, at 917. By the mid-twentieth century, nearly every state had adopted some form of debt limitation. *Id.* at 917 n.55; C. Robert Morris, Jr., *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions*, 68 YALE L.J. 234, 240-41 (1958). The general purpose of constitutional debt limits has been described as being based on the reality "that governments are congenital borrowers who often deal unwisely" by resorting to "excessive borrowing" when "caught between the popular pressures for new developments and against additional taxes." *Id.* at 247.

[16] Fino, *supra* note 7, at 977-78; *see also* Morris, *supra* note 15, at 241 (municipalities).

[17] *See* Fino, *supra* note 7, at 977-78; Reuven Mark Bisk, Note, *State and Municipal Lease-Purchase Agreements: A Reassessment*, 7 HARV. J.L. & PUB. POL'Y 521, 525-26 (1984) (explaining that municipal debt restrictions arose from municipalities purchasing railroad stock with borrowed funds "to persuade the railroad to pass through
(continued...)

restrictions was the public authority, which first became popular in the 1930s.[18] In theory, a public authority or public corporation would be a distinct unit from the state for most purposes and could issue bonds, levy charges, and repay its debts without violating constitutional debt restrictions.[19]

### B.    Proceedings Of The Alaska Constitutional Convention

More than a century after the Panic of 1837,[20] the framers of our constitution sought to preserve the role of the people as a check against the incurrence of unnecessary debt, rather than impose a strict debt limit.[21] The Delegates received extensive materials in advance of the convention, including copies of every state constitution[22] and a collection of reports drafted on behalf of the Alaska Statehood

---

[17]    (...continued) its town," but that practice ended with the Depression of 1873).

[18]    Briffault, *supra* note 6, at 926-27; Morris, *supra* note 15, at 234-39.

[19]    Morris, *supra* note 15, at 234-40; *see also Lonegan I*, 809 A.2d 91, 101-02 (N.J. 2002) (collecting cases); *Schulz v. State*, 639 N.E.2d 1140, 1146 (N.Y. 1994) (explaining that "a public authority would be self-supporting" and "would separate their administrative and fiscal functions from those of the State").

[20]    *See* VICTOR FISCHER, ALASKA'S CONSTITUTIONAL CONVENTION, at vii (1975).

[21]    In this sense, a "strict" debt limit refers to "[a] ceiling placed on borrowing by . . . [the] government" by "prohibit[ing] the state[] from incurring debt in excess of a stated amount." *Debt Limitation*, BLACK'S LAW DICTIONARY (11th ed. 2019). Such limits are often expressed by a percentage of total revenue; for example, Hawaii prohibits the legislature from issuing general obligation bonds if doing so would cause the total outstanding debt to exceed 18.5% of the average general fund revenues from the prior three years. Haw. Const. art. VII, § 13.

[22]    *See* ALASKA STATEHOOD COMM., HANDBOOK FOR DELEGATES TO THE ALASKA CONSTITUTIONAL CONVENTION 4-5 (Nov. 8, 1955) [hereinafter DELEGATE (continued...)

Committee.[23]  The report on state finance in particular recognized that strict debt limitations "reflect a fear that the state may borrow itself into insolvency" and "are common in state constitutions."[24]  The report viewed the efficacy of such debt limits as "questionable," despite their widespread proliferation, based on the assumption that "[t]he era of heavy borrowing for economic development . . . is long past."[25]  The report concluded by noting that a democratically elected legislature and market pressures "seem to make constitutional debt restrictions . . . unnecessary," and thus suggested only a constitutional requirement that the legislature specify the sources for financing appropriations.[26]  The Committee on Finance and Taxation,[27] which was responsible for the task of drafting what would become article IX, rejected this reasoning when it included a number of debt restrictions in its initial proposal.[28]

---

[22]  (...continued)
HANDBOOK], http://www.akleg.gov/pdf/billfiles/ConstitutionalConvention/Folder%20106.pdf.

[23]  CONSTITUTIONAL STUDIES, *supra* note 1; *see also State v. Alex*, 646 P.2d 203, 209 n.5 (Alaska 1982) (noting that Delegates to the Constitutional Convention all received the Alaska Statehood Committee's reports).

[24]  3 CONSTITUTIONAL STUDIES, *supra* note 1, pt. IX, at 21.

[25]  *Id.* at 23.

[26]  *Id.*

[27]  The Committee on Finance and Taxation consisted of Delegates Dorothy J. Awes, Frank Barr, James Nolan, Frank Peratrovich, Chris Poulsen, and Barrie M. White, with Leslie Nerland as the Chair.  6 PACC App. V at 104 (Dec. 16, 1955).  The Committee appointed Frank Barr as its Vice-Chair and Barrie M. White as Secretary. 1 PACC 264 (Nov. 16, 1955).

[28]  *See* 6 PACC App. V at 105-09 (Dec. 16, 1955).

> The Committee did consider for a time allowing the legislature to provide for a debt up to a certain limit, but that was decided against, so at the present time the only debt of the state now which can be allowed is a debt to be paid out of anticipated revenues, that is from year to year, except a debt which must be approved by the people on referendum. In other words, the people are the ones that put the limit on any public debt, any large amount.[29]

The Committee rejected other forms of debt restrictions[30] and specifically rebuffed a suggestion to adopt a strict percentage-based debt ceiling.[31] The Committee reasoned that any amount "would perhaps be either inadequate, too high or too low, and would not offer any protection either way."[32] After "a good deal of consideration," the Committee decided that rather than "leaving it entirely to the legislature" or setting a strict debt limit, it would adopt a reasonable middle ground — "that a referendum be called for and . . . the approval by the qualified voters be obtained."[33] Delegate White summarized this rationale best in the continuation of his statement we quoted at the outset:

> [A] bond proposal to the people via referendum is the greatest way that you can take as a minimum requirement to insure that the credit of the state will not be impaired. . . .

---

[29] 2 PACC 1112 (Dec. 19, 1955) (statement of Del. Frank Barr).

[30] *Id.* (statement of Del. Barrie M. White) ("We considered other limitations and discarded them.").

[31] 3 PACC 2302-03 (Jan. 16, 1956) (statement of Del. Leslie Nerland).

[32] *Id.* at 2303.

[33] *Id.* at 2302.

[T]he basic question here is whether or not you want the people of the state to pass on an incurrence of debt or whether you want to leave it to the legislature.[34]

One proposed amendment would have nevertheless permitted a two-thirds vote of the legislature to contract debt without a public referendum.[35] Delegates in opposition argued that "the people should be allowed to vote on whether or not the state shall become indebted."[36] Delegate White, who also served as Committee Secretary, reiterated that "[i]t is the opinion of the majority of the Committee that such debt should be approved by the voters."[37] Delegates in favor of giving the legislature more control suggested "that two-thirds of each house will more adequately protect the credit of the state" than a public referendum,[38] while some noted that similar provisions had seen success in other state constitutions.[39] Others pointed to the revenue bond exception, reasoning that a strict public referendum requirement would "force the state" to rely on establishing separate corporations and selling revenue bonds, which would in turn "force a much higher interest rate on the taxpayers of Alaska."[40] Those arguments were rejected when the Delegates voted to delete the two-thirds language from the proposed

---

[34]    4 PACC 2434 (Jan. 17, 1956) (statement of Del. Barrie M. White).

[35]    *Id.* at 2421.

[36]    *Id.* at 2432 (statement of Del. W.O. Smith).

[37]    *Id.* at 2434 (statement of Del. Barrie M. White).

[38]    *Id.* at 2424 (statement of Del. Seaborn J. Buckalew).

[39]    *Id.* at 2421-22 (statement of Del. Burke Riley).

[40]    *Id.* at 2435-36 (statement of Del. Victor Fischer). The response to this argument was that higher interest rates are "merely an added inducement to go back to the referendum where such issues ought to be." *Id.* at 2437 (statement of Del. Barrie M. White).

amendment.[41] Another proposed amendment would have permitted the legislature to set the voting requirements for municipal bond measures, but that too was defeated.[42] The Delegates preferred to keep the public referendum procedures intact as a check against future legislatures.

Of course, the framers also recognized that an appropriate amount of flexibility would be necessary for the State to meet unforseen financial situations in the future.[43] Section 11 provides that flexibility by permitting the State to issue "revenue bonds . . . when the only security is the revenues of the enterprise or corporation" and eliminating any restrictions on "refunding indebtedness of the State."[44] And because those exceptions might not sufficiently alleviate section 8's debt prohibition, section 10 allows the State to "borrow money to meet appropriations" without restriction, under the sole caveat that "all debt so contracted shall be paid before the end of the next fiscal year."[45] Debate surrounding the anti-dedication provisions in section 7 likewise echoed the Delegates' desire to limit debt by preserving legislative discretion to freely allocate appropriations from the general fund.[46] In providing a select and limited handful of

---

[41]     *Id.* at 2437-38.

[42]     *See* 3 PACC 2335-43 (Jan. 16, 1956).

[43]     *See* 1 PACC 9 (Nov. 8, 1955) (statement of Robert B. Atwood, Chair, Alaska Statehood Committee) (noting that Alaskans do not want "unwise restrictions and all the other abhorrent developments that come from an inflexible constitution").

[44]     Alaska Const. art. IX, § 11.

[45]     *Id.* § 10.

[46]     *See id.* § 7; 4 PACC 2364 (Jan. 17, 1956) (statement of Del. Barrie M. White); *id.* at 2368 (statement of Del. Dorothy J. Awes); *id.* at 2409 (statement of Del. Mildred R. Hermann); *id.* at 2413 (statement of Del. Seaborn J. Buckalew); 6 PACC
(continued...)

pathways to incur and manage "state debt," the framers sought to balance competing ideals of fiscal restraint and flexibility.[47]

Belying the depth of debate on article IX, section 8, the framers refrained from attaching a technical definition to the term "debt."[48] Instead, section 8 was intended to apply broadly to the contracting of all "ordinary debt."[49] The Delegates entertained varying views on what this restriction encompassed[50]: some referred to section 8 as

---

[46]     (...continued)
App. V at 111 (Dec. 16, 1955).

[47]     *See* 2 PACC at 1109 (Dec. 19, 1955) (statement of Del. Barrie M. White) ("[Article IX] is aimed to assure a sound system of finance and taxation and leave as much leeway to the state as possible and the sound practices to be carried out in the future.").

[48]     Other state constitutions reviewed by the Delegates took the opposite approach.  *See, e.g.*, Wash. Const. art. VIII, § 1(d) (defining "debt" as "borrowed money . . . secured by the full faith and credit of the state").

[49]     2 PACC 1110-11 (Dec. 19, 1955) (statement of Del. Barrie M. White); *see also id.* at 1112 ("The only limitations here are that *ordinary debts* be submitted to the voters for approval . . . ." (emphasis added)).

[50]     The most pertinent opinions are perhaps those of the Committee on Finance and Taxation.  In its initial proposal, the Committee noted that it "considered and incorporated in this report many of the ideas contained in convention proposals numbered 3, 4, 6 (Sections 8, 10, 11 and 12), 20 and 41."  6 PACC App. V at 104 (Dec. 16, 1955).  Of particular relevance here is Delegate Proposal No. 4, introduced by Delegate R.E. Robertson, which proposed a strict percentage limit for all "current, bonded, and other indebtedness" of the State.  Del. Proposal No. 4, § 1, Alaska Constitutional Convention (Nov. 17, 1955), http://www.akleg.gov/pdf/billfiles/Consti tutionalConvention/Folder%20300.pdf.  Although the Committee rejected such a restriction, this proposal suggests it was aware that Delegates understood the term "debt" to mean more than just bonded indebtedness.  While Delegate Proposal No. 6 dealt with public education, section 12's proposed language bears a striking resemblance to article

(continued...)

limiting the ability to "borrow money,"[51] others as placing limitations on "reasonable borrowing."[52] Still others were more generally concerned with preserving the State's credit.[53] At its narrowest, some Delegates thought of section 8 as applying only to "general obligation bonds," although that was usually when framed as the opposite of "revenue bond[s]."[54] Despite these differences, one commonality is that the Delegates

---

[50]   (...continued)
IX, section 8 of the Alaska Constitution.  *Compare* Del. Proposal No. 6, § 12, Alaska Constitutional Convention (Nov. 17, 1955), http://www.akleg.gov/pdf/billfiles/ConstitutionalConvention/Folder%20300.pdf ("The State shall incur no public school debt without first obtaining sanction of the people of the State in a state-wide referendum . . . ."), *with* Alaska Const. art. IX, § 8.  The Committee was therefore well aware of the importance Delegates placed on public referenda for any type of debt approval, even school bonds.

[51]   *See* 2 PACC 1112 (Dec. 19, 1955) (statement of Del. Maurice T. Johnson) ("[I]n Section 9 and 10 there seems to be a limitation on the right of the state to borrow money.").  At this point in the Convention, "Section 9" referred to what would eventually be split into current sections 8 and 9 of article IX.  *See* 3 PACC 2301-04 (Jan. 16, 1956) (renumbering as section 8); 4 PACC 2421-41 (Jan. 17, 1956) (splitting into separate provisions for state and local debts).

[52]   3 PACC 2338 (Jan. 16, 1956) (statement of Del. John H. Rosswog).

[53]   *See* 4 PACC 2424 (Jan. 17, 1956) (statement of Del. Seaborn J. Buckalew) ("Now the only reason that you have any limitations or restrictions on the legislature is to prevent the legislature from impairing the credit of the state."); 2 PACC 1112 (Dec. 19, 1955) (statement of Del. Barrie M. White) (noting that the credit of states with a "dollar or percentage [debt] limitation . . . is generally no better than the credit of states that have no debt limitations").

[54]   *See, e.g.*, 3 PACC 2303 (Jan. 16, 1956) (statement of Del. Leslie Nerland) ("[Section 11] refers only to the allowance of contracting of *revenue debt* without the restrictions of the previous section on *general obligations*." (emphasis added)); 4 PACC 2393 (Jan. 17, 1956) (statement of Del. Victor C. Rivers) (differentiating between the requirement for a public referendum for "general obligation bonds" as opposed to
(continued...)

understood that at its core the objective of section 8 was to control and restrict the issuance of bonds.[55] Thus, the public referendum requirement itself was considered paramount as "a necessary safeguard against excessive bonding."[56] The people of the Territory of Alaska subsequently ratified the Delegates' proposed Alaska Constitution on April 24, 1956.[57]

### C. The 2003 And 2006 Oil And Gas Exploration Tax Credits

The saga of the transferrable oil and gas exploration tax credits begins with the decline of oil and gas production in Cook Inlet. Facing a maturing oil field and shrinking revenues,[58] the legislature in 2003 sought to prolong the life of existing

---

[54]     (...continued) "revenue bond[s]"). The framers did not discuss "subject-to-appropriation" bonds, as this concept would not be developed until almost a decade later. *See Schulz v. State*, 639 N.E.2d 1140, 1148 (N.Y. 1994) (noting that the term " 'moral obligation' debt" was "apparently coined in the 1960's to describe appropriation-risk bonds that could not legally bind the Legislature beyond a session").

[55]     *See, e.g.*, 3 PACC 2302 (Jan. 16, 1956) (statement of Del. Leslie Nerland) ("Section [8] is one regarding the contracting of bonded indebtedness . . . ."); *id.* at 2317 (statement of Del. Maurice T. Johnson) ("[W]ith reference to Section 8 . . . the one on the matter of bonded indebtedness . . . ."); *id.* at 2336 (statement of Del. Victor Fischer) ("I'm not against requiring a referendum before a local government unit can issue bonds . . . ."); *id.* at 2342 (statement of Del. Edward V. Davis) ("[U]nits of local government, as well as the state, should be governed by some basic rules before they can bond."); *see also* 2 PACC 941 (Dec. 16, 1955) (statement of Del. Ralph J. Rivers) ("Bonding would be to borrow . . . .").

[56]     3 PACC 2337 (Jan. 16, 1956) (statement of Del. Leslie Nerland).

[57]     *See* Act of July 7, 1958, Pub. L. No. 85-508, § 1, 72 Stat. 339, 339 (providing for the admission of the State of Alaska into the Union).

[58]     Minutes, S. Res. Comm. Hearing on S.B. 185, 23d Leg., 1st Sess. 2-3 (May 6, 2003) (testimony of Mark Myers, Dir., Div. of Oil and Gas, Dep't of Nat. Res.), (continued...)

operations in the region by reducing the amount of royalties owed,[59] which in turn would help preserve Alaskans' jobs in the oil and gas industry.[60] Aside from rescuing the Cook Inlet oil fields, the legislature also created new, transferrable exploration tax credits[61] to encourage production in marginal fields, thereby spurring job growth and future revenue.[62] The transferability of these credits was intended to assist small, independent "wildcat" explorers by permitting these future tax reductions to be sold on the existing market in exchange for capital to fund current operations.[63]

Three years later a new form of transferrable tax credit was introduced.[64] The 2006 oil and gas exploration tax credits were passed alongside a new production tax,[65] which restructured the prior oil and gas royalties regime to shift away from a gross

---

[58]     (...continued) http://www.akleg.gov/PDF/23/M/SRES2003-05-061610.PDF.

[59]     *See* ch. 59, § 2, SLA 2003 (codified as amended at AS 38.05.180(f)(6)).

[60]     Minutes, S. Res. Comm. Hearing on S.B. 185, 23d Leg., 1st Sess. 22 (May 5, 2003) (statement of Gary Carlson, Senior Vice President, Forest Oil Corp.), http://www.akleg.gov/PDF/23/M/SRES2003-05-051534.PDF.

[61]     *See* ch. 59, § 3, SLA 2003 (codified as amended at AS 43.55.025).

[62]     Minutes, S. Fin. Comm. Hearing on S.B. 185, 23d Leg., 1st Sess. 9-10 (May 13, 2003) (statement of Sen. Thomas Wagoner, Sponsor), http://www.akleg.gov /PDF/23/M/SFIN2003-05-131641.PDF.

[63]     Minutes, S. Fin. Comm. Hearing on S.B. 185, 23d Leg., 1st Sess. 8-9 (May 14, 2003) (statement of Dan Dickinson, Dir., Tax Div., Dep't of Revenue), http://www.akleg.gov/PDF/23/M/SFIN2003-05-140940.PDF.

[64]     Ch. 2, § 13, TSSLA 2006 (codified as amended at AS 43.55.023).

[65]     *Id.* § 25 (codified as amended at AS 43.55.160).

tax on production to a tax on net revenues.[66]  Governor Frank Murkowski's transmittal

letter explained that the overhaul was necessary for "encouraging investment in the state"

and that it would "provide fiscal certainty for future generations of Alaskans."[67]  The

legislature heard testimony that the new tax credits would stimulate reinvestment in the

State and have an immense impact on the economics of oil and gas exploratory

operations.[68]  These transferrable tax credits could then be used by the recipient to reduce

its production taxes in any given year,[69] or they could be sold to another producer who

could then use the transferred credits to reduce its own tax liability.[70]  The recipient could

likewise request the Department of Revenue to purchase its tax credits, subject to

availability of annual legislatively appropriated funds.[71]  The legislature subsequently

created an oil and gas tax credit fund (Fund) to facilitate discretionary purchase of both

---

[66]     *See* 2006 Senate Journal 2258-62 (governor's transmittal letter for precursor bill); Minutes, H. Fin. Comm. Hearing on H.B. 3001, 24th Leg., 3d Sp. Sess. 3-4 (July 25, 2006) (statement of Robynn Wilson, Dir., Tax Div., Dep't of Revenue), http://www.akleg.gov/PDF/24/M/HFIN2006-07-251017.PDF (explaining the difference between gross and net taxes as applied to oil production).

[67]     2006 House Journal 4221-22.

[68]     Minutes, *supra* note 66, at 9-10 (statement of Pedro van Meurs, Consultant, Office of the Governor).

[69]     Ch. 2, § 13, TSSLA 2006 (codified as amended at AS 43.55.023(a), (c)); *see also* ch. 59, § 3, SLA 2003 (codified as amended at AS 43.55.025(a)-(b), (f), (i)).

[70]     Ch. 2, § 13, TSSLA 2006 (codified as amended at AS 43.55.023(d)); *see also* ch. 59, § 3, SLA 2003 (codified as amended at AS 43.55.025(g)-(h)).

[71]     Ch. 2, § 13, TSSLA 2006, *repealed by* Ch. 1, § 67, SSSLA 2007.

2003 and 2006 tax credits,[72] once again reliant on appropriations from the legislature.[73] At no time was the State under any obligation to purchase tax credits.

Despite the legislature's good intentions, oil prices plummeted in the latter half of 2014,[74] and Alaska began to face serious budgetary constraints.[75] The purchase of the combined 2003 and 2006 oil and gas exploration tax credits soon became "unsustainable," and responding to "challenging fiscal times," Governor Bill Walker signed a partial veto to reduce the legislature's annual appropriation to the Fund.[76] The legislature phased out the tax credits in 2016,[77] effectively terminating the program in 2017.[78] However, the tax credits that had already been issued remained in circulation, with an estimated $800 million in outstanding requests for purchase and another $200 million expected.[79] Governor Walker proposed his solution in House Bill (HB) 331.[80]

---

[72] Ch. 1, § 46, SSSLA 2007 (codified as amended at AS 43.55.028).

[73] AS 43.55.028(b)(1).

[74] *See generally* Minutes, H. Fin. Comm. Hearing on Revenue Forecast, Oil and Gas Tax Credits, and FY 16 Budget Overview, 29th Leg., 1st Sess. (Jan. 27, 2015), http://www.akleg.gov/PDF/29/M/HFIN2015-01-271330.PDF (discussing the causes of the 2014 oil price decline and its potential effects on Alaska's budget).

[75] 2018 House Journal 2341.

[76] 2015 House Journal 1324-25.

[77] Ch. 4, 4SSLA 2016.

[78] Ch. 3, SSSLA 2017.

[79] 2018 House Journal 2341.

[80] *See* Committee Substitute House Bill (C.S.H.B.) 331, 30th Leg., 2d Sess. (2018).

## D. HB 331 Rationale, Main Provisions, And Legislative History

In his transmittal letter, Governor Walker described HB 331 as "the next vital step in resolving the State's oil and gas tax credit obligation."[81] In the wake of falling oil prices and the State's reluctance to purchase outstanding tax credits, small producers faced many difficulties borrowing money to complete various projects.[82] Legislators heard firsthand accounts from participants in the oil and gas industry on how the tax credit program was essential for encouraging small producers to invest in Alaska,[83] and how uncertainty surrounding discretionary State purchase of those tax credits had already resulted in stalled projects and the loss of hundreds of jobs.[84] Rather than wait several years for a full payment, those small producers preferred to take a discount in exchange for certainty.[85] Financiers likewise testified how the tax credits had been monetized to secure loans for various exploratory projects[86] and that some small producers had already defaulted on their loans and were unable to access additional

---

[81]    2018 House Journal 2341.

[82]    *Id.*

[83]    Minutes, H. Fin. Comm. Hearing on H.B. 331, 30th Leg., 2d Sess. 15 (Apr. 23, 2018) (statement of Kara Moriarty, CEO, Alaska Oil & Gas Ass'n), http://www.akleg.gov/PDF/30/M/HFIN2018-04-231335.PDF; *id.* at 18-19 (statement of Pat Foley, Senior Vice President, Caelus Alaska).

[84]    *Id.* at 20-21 (statement of Pat Foley, Senior Vice President, Caelus Alaska); *id.* at 22-23 (statement of Jeff Hastings, CEO, SA Exploration).

[85]    *Id.* at 13 (statement of Thomas Ryan, Managing Dir., Structured Fin. Grp., ING Capital, LLC).

[86]    Minutes, H. Res. Comm. Hearing on H.B. 331, 30th Leg., 2d Sess. 7 (Apr. 4, 2018) (statement of Thomas Ryan, Managing Dir., Structured Fin. Grp., ING Capital, LLC), http://www.akleg.gov/PDF/30/M/HRES2018-04-041337.PDF.

equity due to uncertainty about future tax credit purchases.[87]  Some legislators framed the goal of HB 331 as to "salvage" small producers "on the edge" that have "put Alaskans to work," but who still "owe their creditors many millions of dollars" and are now "barely hanging on."[88]  At the same time, because HB 331 created a process that would purchase those tax credits at a discount, other legislators reasoned that the bonds would be "revenue-neutral," with the discount paying for interest on the proposed bonds.[89]

HB 331 attempts to accomplish both the governor's and the legislature's policy goals by creating a public corporation to issue and sell bonds, using those proceeds to purchase tax credits at a discount, and then repaying bondholders via a predictable schedule of future legislative appropriations.[90]  First, the bill establishes the Alaska Tax Credit Certificate Bond Corporation (Corporation) within the Department of Revenue.[91]  The Corporation's board of directors consists of three commissioners from

_____

[87]   *Id.* at 10-11 (statement of Peter Clinton, Managing Dir., Credit Restructuring, ING Capital, LLC).

[88]   S. Floor Deb. on C.S.H.B. 331, 30th Leg., 2d Sess. 3:42 (May 11, 2018) (statement of Sen. Peter Micciche), https://www.ktoo.org/gavel/video/?clientID=2147 483647&eventID=2018051073.

[89]   H. Floor Deb. on C.S.H.B. 331, 30th Leg., 2d Sess. 1:10 (May 3, 2018) (statement of Rep. Ivy Spohnholz), https://www.ktoo.org/gavel/video/?clientID=2147 483647&eventID=2018051020.

[90]   *See* 2018 House Journal 2342; Mike Barnhill & Ken Alper, Dep't of Revenue, HB331: Oil & Gas Tax Credit Bond Proposal Presentation to Commonwealth North, 30th Leg., 2d Sess. 10-14 (Mar. 30, 2018), http://www.akleg.gov/basis/get_documents.asp?session=30&docid=53914 (presented to H. Res. Comm.).

[91]   AS 37.18.010.

the Executive Department: the Commissioner of Commerce, Community, and Economic Development; the Commissioner of Administration; and the Commissioner of Revenue.[92] Although the Corporation has the power to contract for services related to bond sales,[93] it has no employees.

Second, the Corporation is empowered to issue up to $1 billion in bonds, with that bonding authority to expire on December 31, 2021.[94] Bonds may be issued subsequent to a bond resolution fixing their terms.[95] Proceeds from bond sales — after covering issuance and administration costs — will be used to purchase outstanding tax credits through the existing Fund[96] at a discount of up to 10 percent.[97] Furthermore, bonds may be issued only if the Corporation finds that the discount rate would exceed the interest costs by 1.5 percent or more annually.[98] The Corporation may also refund bonds if doing so would be in the State's best interest, and it is authorized to separately issue refunding bonds and contract with a refunding trustee.[99] To facilitate this, the

---

[92]     AS 37.18.020.

[93]     AS 37.18.030(e).

[94]     AS 37.18.030(a)-(b).

[95]     AS 37.18.060; *see also* AS 37.18.050 (describing the parameters of bond terms).

[96]     AS 37.18.010; AS 43.55.028.  The bond proceeds would be used to purchase both types of oil and gas exploration tax credits issued under AS 43.55.023 and AS 43.55.025, as well as claims for non-transferrable tax credits under existing programs in AS 43.20.046, AS 43.20.047, and AS 43.20.053.

[97]     AS 43.55.028(*l*)-(m).

[98]     AS 37.18.080.

[99]     AS 37.18.090.  If necessary, the Corporation is also permitted to provide
(continued...)

Corporation may establish a reserve fund to hold money appropriated by the legislature for bond repayments,[100] as well as accrued interest on bond proceeds.[101] The reserve fund exists solely for the purpose of payments on the interest and principal of bonds.[102]

Finally, HB 331 makes all bond repayments "subject to appropriation,"[103] and the legislature is not explicitly required to deposit money in the reserve fund.[104] Certain bondholders can bring an enforcement action in state court to compel payment of their bonds,[105] although HB 331 limits lawsuits on the constitutionality or validity of the bill or of any bonds to be filed within 45 days after the Corporation adopts a bond resolution.[106] Perhaps in apprehension of just such a constitutional challenge, HB 331 contains several disclaimers:

> The bonds do not constitute a general obligation of the state and are not state debt within the meaning of art. IX, sec. 8, Constitution of the State of Alaska. Authorization by the

---

[99] (...continued)
security for bonds by entering into credit-enhancement agreements. AS 37.18.050(b).

[100] AS 37.18.040(a)(1).

[101] AS 37.18.030(a).

[102] AS 37.18.040(b). The Corporation must also set a "required debt service reserve" threshold via resolution, and it may not issue further bonds if the amount on deposit in the reserve fund falls below that threshold. AS 37.18.040(f), (j). But it can deposit bond proceeds to meet that threshold and is permitted to issue bonds for the purpose of replenishing the reserve fund to the required amount. AS 37.18.040(f).

[103] *See* AS 37.18.040(i); AS 43.20.046(e); AS 43.20.047(e); AS 43.20.053(e); AS 43.55.028(e).

[104] AS 37.18.040(g) ("the legislature *may* appropriate" (emphasis added)).

[105] AS 37.18.070.

[106] AS 37.18.110.

legislature and ratification by qualified voters of the state is not required under art. IX, sec. 8, Constitution of the State of Alaska.[107]

Aside from differences in policy preferences among legislators the questionable constitutionality of the bonding arrangement in HB 331 generated its fair share of controversy. At the outset, the Legislative Affairs Agency provided a memorandum doubting whether HB 331 could qualify under any constitutional exception for incurring debt.[108] The memorandum cited a Georgia case[109] interpreting similar constitutional debt restrictions for the proposition that "a public corporation may not be used for the purpose of circumventing" article IX, section 8.[110] The Department of Law responded with its own analysis, arguing that subject-to-appropriation bonds "do not constitute a form of 'constitutional debt,' "[111] and the Governor formally requested an opinion from the Attorney General.[112] Rather than attempt to fit HB 331 within any

---

[107]     AS 37.18.030(c); *see also* AS 37.18.040(g) ("Nothing in this subsection creates a debt or liability of the state.").

[108]     Emily Nauman, Legislative Affairs Agency, Memorandum on Constitutionality of HB 331, 30th Leg., 2d Sess. 3-7 (Apr. 13, 2018), http://www.akleg.gov/basis/get_documents.asp?session=30&docid=56309.

[109]     *State Ports Auth. v. Arnall*, 41 S.E.2d 246, 254 (Ga. 1947).

[110]     Nauman, *supra* note 108, at 7; *see also* H. Floor Deb. on C.S.H.B. 331, *supra* note 89, at 12:40 (statement of Rep. David Guttenberg) (praising the legal analysis in the Legislative Affairs Agency memo).

[111]     William E. Milks & Mary H. Gramling, Dep't of Law, Memorandum on HB 331, Alaska Tax Credit Certificate Bond Corporation Legislation, 30th Leg., 2d Sess. 1 (Apr. 27, 2018), http://www.akleg.gov/basis/get_documents.asp?session=30&docid =56443.

[112]     STATE OF ALASKA, DEP'T OF LAW, OP. ATT'Y GEN., 2018 WL 2092127, at
(continued...)

exception under article IX, the Attorney General relied heavily on a New Jersey case[113] to argue that "subject-to-appropriation debt is not subject to the restrictions of article IX, section 8."[114] But state officials testifying before the legislature took a broader approach, framing HB 331 on several occasions as simply refunding existing debt[115] or as potentially qualifying as a revenue bond.[116]

Legislators in favor of the bill tried to pigeonhole HB 331 into one of the established exceptions for article IX, section 8. Despite the discretionary nature of the existing program for tax credit purchases, the most common refrain was that HB 331 was

---

[112]    (...continued)
*1 (May 2, 2018) [hereinafter OP. ATT'Y GEN.].

[113]    *Lonegan v. State* (*Lonegan II*), 819 A.2d 395 (N.J. 2003).

[114]    OP. ATT'Y GEN., *supra* note 112, at *6; *see also* Minutes, H. Fin. Comm. Hearing on H.B. 331, 30th Leg., 2d Sess. 22 (Apr. 27, 2018) (statement of Mike Barnhill, Deputy Comm'r, Dep't of Revenue), http://www.akleg.gov/PDF/30/M/HFIN2018-04-270906.PDF (arguing that subject-to-appropriation bonds are not state debt under article IX and noting that the administration was not "attempt[ing] to seek an exemption").

[115]    Minutes, *supra* note 86, at 23 (statement of Sheldon Fisher, Comm'r, Dep't of Revenue) (reasoning that HB 331's impact on Alaska's credit rating would be minimal as "one form of obligation would be converted into a different form of obligation").

[116]    Minutes, H. Res. Comm. Hearing on H.B 331, 30th Leg., 2d Sess. 9-10 (Apr. 6, 2018) (statement of Deven Mitchell, Exec. Dir., Alaska Mun. Bond Bank Auth., Dep't of Revenue), http://www.akleg.gov/PDF/30/M/HRES2018-04-061303.PDF (noting that bonding format had not been finalized and "it could also be structured . . . potentially as a revenue bond" (omission in original)). *But see* Deven Mitchell, Dep't of Revenue, Memorandum on Debt Potentially Impacted by Broad Interpretation of "Debt" in Alaska Constitution, 30th Leg., 2d Sess. 2 (Apr. 16, 2018), http://www.akleg.gov/basis/get_documents.asp?session=30&docid=56197 ("[T]he intention of using a public corporation to issue bonds . . . was not to fall into the exception clause in the Alaska Constitution . . . .").

"refunding indebtedness" under section 11.[117] The floor debates were replete with such statements: "This bill goes a long way towards fulfilling our promise and redeeming that unpaid debt."[118] "It's far better that we do this and finance our debt than pay it all back at once."[119] "Obviously, we're not really incurring new debt, . . .we're changing the nature of existing debt."[120] "[T]his is not new debt."[121] "I don't believe we're taking on a debt.  We're already in debt here."[122]  "The bond package before us is really a mechanism to refinance the current debt at a discounted rate . . . ."[123]

Some legislators also likened HB 331 to revenue bonds,[124] noting "that if we owe $100 and we only have to pay $90, there was some kind of revenue in

---

[117]     *See* Alaska Const. art. IX, § 11 ("The restrictions do not apply to indebtedness to be paid from special assessments on the benefited property, nor do they apply to refunding indebtedness of the State or its political subdivisions.").

[118]     H. Floor Deb. on C.S.H.B. 331, *supra* note 89, at 12:29 (statement of Rep. Dan Saddler).

[119]     *Id.* at 12:32.

[120]     *Id.* at 12:37 (statement of Rep. Andrew Josephson).

[121]     *Id.* at 12:42 (statement of Rep. David Talerico).

[122]     *Id*. at 2:56 (statement of Rep. George Rauscher), https://www.ktoo.org/gavel/video/?clientID=2147483647&eventID=2018051026.

[123]     S. Floor Deb. on C.S.H.B. 331, *supra* note 88, at 4:18 (statement of Sen. Anna MacKinnon).

[124]     *See* Alaska Const. art. IX, § 11 ("The restrictions on contracting debt do not apply to debt incurred through the issuance of revenue bonds by a public enterprise or public corporation of the State or a political subdivision, when the only security is the revenues of the enterprise or corporation.").

between."[125] To further leave open the revenue bond argument, the House Finance Committee amended HB 331 to ensure that interest from overriding royalty agreements would be "separately account[ed] for" in the general fund as "revenue."[126] The Committee also rejected an amendment that would have explicitly disclaimed any reliance on the revenue bond rationale within the bill's text.[127]

HB 331 passed the House on May 3,[128] passed the Senate on May 11,[129] and Governor Walker signed it into law on June 20, 2018.[130]

### E.    Proceedings

Eric Forrer brought suit against the State and the Commissioner of the Department of Revenue, in his official capacity,[131] on May 14, 2018 — only three days after HB 331 passed the Senate. Forrer's original complaint primarily sought declaratory and injunctive relief on the grounds that the bonding scheme in HB 331 violated multiple

---

[125]    S. Floor Deb. on C.S.H.B. 331, *supra* note 88, at 4:17 (statement of Sen. Anna MacKinnon).

[126]    Minutes, *supra* note 114, at 15-17. The legislature then "may appropriate" any "revenue" gained from those overriding royalty agreements into the Corporation's reserve fund. AS 44.37.230(i). The State has never relied on this section in defense of HB 331.

[127]    Minutes, *supra* note 114, at 21-24.

[128]    2018 House Journal 3563.

[129]    2018 Senate Journal 3091.

[130]    2018 House Journal 3849.

[131]    The Commissioner at the time Forrer initially filed suit was Sheldon Fisher, then Bruce Tangeman replaced him in this action, followed in 2020 by the current Commissioner, Lucinda Mahoney. *Forrer v. State*, No. S-17377 (Alaska Supreme Court Order, Feb. 24, 2020).

sections of article IX of the Alaska Constitution. The State did not answer Forrer's complaint but instead moved to dismiss for failure to state a claim.[132] The State supported its motion to dismiss with a 40-page memorandum and appended "a thick volume of legislative history for HB 331." The superior court ruled that the "inclusion of statutory history in support of a motion to dismiss . . . does not convert [it] into a motion for summary judgment."[133] The case was amenable to resolution without further briefing, in the superior court's reasoning, because the controversy turned entirely on "questions of law." The superior court rejected the State's arguments that the article IX, section 11 exceptions for revenue bonds or refunding indebtedness applied to HB 331. Nonetheless, the superior court granted the State's motion to dismiss on the grounds that HB 331 did not "create a legally enforceable debt" under the framework announced in *Carr-Gottstein Properties v. State* upholding a lease-purchase agreement against an article IX, section 8 challenge.[134] Forrer appeals.

Forrer argues on appeal that the superior court erred by granting the State's motion to dismiss without accepting all of his allegations as true and without converting it into a motion for summary judgment.[135] Forrer also renews his constitutional

---

[132]    *See* Alaska R. Civ. P. 12(b)(6).

[133]    The superior court also relied on Delegates' statements from the Alaska Constitutional Convention to reach its decision. Motions to dismiss must be converted to motions for summary judgment when "matters outside the pleading are presented to and not excluded by the court." Alaska R. Civ. P. 12(b); *see also* Alaska R. Civ. P. 56 (summary judgment).

[134]    899 P.2d 136, 144 (Alaska 1995) (per curiam).

[135]    Forrer specifically argues that the superior court was wrong "to address the merits of [his] constitutional claims in the context of a Motion to Dismiss." We interpret this as reviving his prior argument that the procedural posture should have been treated
(continued...)

arguments against HB 331 in respect to article IX, section 7,[136] section 8,[137] and section 10.[138] We do not reach Forrer's arguments on section 7 and section 10.[139]

## III. STANDARD OF REVIEW

We review de novo the grant of a motion to dismiss under Alaska Civil Rule 12(b)(6).[140] "In reviewing a Rule 12(b)(6) dismissal, we liberally construe the complaint and treat all factual allegations in the complaint as true."[141] We have consistently held that dismissals under Rule 12(b)(6) "should be granted only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief.' "[142]

---

[135]    (...continued)
as that of summary judgment.

[136]    Alaska Const. art. IX, § 7 (prohibiting dedicated funds).

[137]    *Id.* § 8 (restricting the contracting of "state debt").

[138]    *Id.* § 10 (permitting interim borrowing).

[139]    To the extent that article IX, section 10 serves as another exception to the debt restrictions in section 8, the State has never argued that this exception applied; in fact, it has conceded that the bonds to be issued under HB 331 would not be repaid within a year. We likewise decline to endorse Forrer's interpretation of section 10 as an independent restriction that prohibits all "long-term debt."

[140]    *Robinson v. Alaska Hous. Fin. Corp.*, 442 P.3d 763, 768 (Alaska 2019) (quoting *Clemensen v. Providence Alaska Med. Ctr.*, 203 P.3d 1148, 1151 (Alaska 2009)).

[141]    *Id.* (quoting *Patterson v. Walker*, 429 P.3d 829, 831 (Alaska 2018)).

[142]    *Id.* (quoting *Clemensen*, 203 P.3d at 1151).

Issues of constitutional interpretation are also reviewed de novo.[143] We have explained that when we interpret the constitution, we first "look to the plain meaning and purpose of the provision and the intent of the framers."[144] "Legislative history and the historical context" assist in our task of defining constitutional terms as understood by the framers.[145] While we have also said that we consider "precedent, reason, and policy,"[146] policy judgments do not inform our decision-making when the text of the Alaska Constitution and the framers' intent as evidenced through the proceedings of the Constitutional Convention are sufficiently clear.[147]

## IV. DISCUSSION

### A. The Superior Court Did Not Err When It Declined To Convert The State's Motion To Dismiss Into A Motion For Summary Judgment.

In the superior court proceedings, Forrer argued that the State, by attaching a number of legislative history materials to its motion to dismiss, automatically converted the motion into one for summary judgment. The superior court ruled otherwise, noting

---

[143] *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017).

[144] *Id.* (quoting *Hickel v. Cowper*, 874 P.2d 922, 926 (Alaska 1994)).

[145] *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016).

[146] *Nelson v. State*, 440 P.3d 240, 243 (Alaska 2019) (quoting *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 (Alaska 2004)).

[147] *See Se. Alaska Conservation Council v. State*, 202 P.3d 1162, 1176-77 (Alaska 2009) (holding that courts must "enforce the considered judgment of the founders" regardless of any "attractive idea" or "deserving purpose" supporting the legislature's attempt to circumvent constitutional restrictions); *cf. Curran v. Progressive Nw. Ins. Co.*, 29 P.3d 829, 833 (Alaska 2001) ("[P]ublic policy can guide statutory construction but cannot override a clear and unequivocal statutory requirement.").

that "statutory history is legal material to be analyzed; it is not evidence of facts."[148] The court also disregarded a number of Forrer's allegations as "unwarranted factual inferences and conclusions of law," then proceeded to dismiss Forrer's suit under Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The superior court correctly concluded that the State's motion to dismiss was proper despite the State's submission of statutory history materials not in the pleadings. Rule 12(b) provides that when "matters outside the pleading are presented to and not excluded by the court, the motion [for dismissal] shall be treated as one for summary judgment and disposed of as provided in Rule 56." Although trial courts retain discretion over whether to convert a motion to dismiss in many instances, we have previously observed that "a court is *required* to do so only if it considers matters outside the pleadings."[149] Whether matters fall "outside the pleading" depends on the nature of those matters — while courts may not generally consider affidavits on a motion to dismiss,[150] "courts may consider materials . . . subject to 'strict judicial notice,' " such as "statutes and regulations, [or] matters of public record."[151] The ministerial act of judicial

---

[148]     *See Cox v. Estate of Cooper*, 426 P.3d 1032, 1042 (Alaska 2018).

[149]     *Bachner Co. v. State*, 387 P.3d 16, 25 (Alaska 2016) (emphasis in original).

[150]     *See Phillips v. Gieringer*, 108 P.3d 889, 892 (Alaska 2005) ("[A] court's inquiry on a motion under Rule 12(b)(6) essentially is limited to the content of the complaint, while summary judgment ' "involves the use of pleadings, depositions, answers to interrogatories, and affidavits." ' " (quoting *Martin v. Mears*, 602 P.2d 421, 426 n.5 (Alaska 1979))).

[151]     *Pedersen v. Blythe*, 292 P.3d 182, 185 (Alaska 2012) (quoting *Martin*, 602 P.2d at 426 n.6).

notice is only required when the "question is one normally decided by the trier of fact."[152]

In contrast, issues of constitutional and statutory interpretation are decidedly questions of law,[153] for which resort to drafting history to clarify the meaning of language is common practice.[154] This is true even in the limited scope of Rule 12(b)(6) motions to dismiss.[155] Moreover, "strict judicial notice" is particularly unnecessary when the complaint itself relies upon those sources. Forrer implicitly called upon the court to exercise "sound judicial interpretation" of the Alaska Constitution, which we have previously noted may require referring to debates of the Constitutional Convention.[156] Nor can Forrer rightly complain about the State attaching HB 331's legislative history to its motion to dismiss when Forrer himself explicitly relies on "statements and testimony before the Alaska Legislature" from various State officials in his complaint. Forrer cannot selectively cherry-pick statements from certain officials in his complaint and then preclude the court from reviewing the bill's history in its entirety. Judicial notice was therefore not required when the superior court considered HB 331's legislative history and the drafting history of the Alaska Constitution as interpretive

---

[152]    Alaska R. Evid. cmt. 201(a).

[153]    *See, e.g.*, *Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007).

[154]    *See, e.g.*, *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Corps., Bus. & Prof'l Licensing*, 414 P.3d 630, 634 (Alaska 2018); *Wielechowski v. State*, 403 P.3d 1141, 1147 (Alaska 2017).

[155]    *See Basey v. State, Dep't of Pub. Safety, Div. of Alaska State Troopers, Bureau of Investigations*, 408 P.3d 1173, 1175-76 (Alaska 2017).

[156]    *See Wielechowski*, 403 P.3d at 1147; *State v. Alex*, 646 P.2d 203, 208-10 (Alaska 1982).

aids.[157] Nor was the mere proffer of publicly available legislative history[158] by the State enough to require the superior court to convert its motion to dismiss into a motion for summary judgment.

Forrer also faults the superior court's treatment of his factual allegations. In ruling on the State's motion to dismiss, the superior court excluded Forrer's submitted affidavits from consideration and expressly rejected several of Forrer's legal conclusions that were "style[d] [as] assertions of fact." We have previously explained that "even on a motion to dismiss, a court is not obliged to accept as true 'unwarranted factual inferences and conclusions of law.' "[159] The "facts" alleged by Forrer in this instance fall

---

[157]    This is not to suggest that judicial notice is *never* required for materials commonly considered part of a bill's legislative history. *See, e.g.*, *McPhail v. Latouche Packing Co.*, 8 Alaska 297, 302-04 (D. Alaska 1931) (weighing whether courts can take judicial notice of the dates of a bill's presentment to the governor and adjournment of the legislature as recorded in the legislature's journal when the controversy involved whether a bill was properly enacted). But many courts allow the consideration of legislative history as an interpretative aid without judicial notice. *See, e.g.*, *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 524 n.9 (Cal. 1998), *as modified* (Sept. 23, 1998) ("A request for judicial notice of published [legislative history] material is unnecessary. Citation to the material is sufficient."); *cf. Cox v. Estate of Cooper*, 426 P.3d 1032, 1034, 1041-42 (Alaska 2018) (upholding an Alaska Rule 77(k) motion for reconsideration of summary judgment where the moving party attached legislative history materials not previously presented to the court). *But see Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959) (taking judicial notice of a statute's legislative history to aid in interpretation).

[158]    The legislative history in question "consist[ed] of a copy of the enrolled bill and transcripts of the house and senate committee proceedings and floor debates." All of these materials are available in some form on the legislature's public website. *See* ALASKA ST. LEGISLATURE, http://www.akleg.gov (last visited June 9, 2020).

[159]    *Haines v. Comfort Keepers, Inc.*, 393 P.3d 422, 429 (Alaska 2017) (quoting *Dworkin v. First Nat'l Bank of Fairbanks*, 444 P.2d 777, 779 (Alaska 1968)).

under the latter category.[160]  And as illustrated above, the superior court was right to exclude materials outside the pleadings — e.g., affidavits — for purposes of a motion to dismiss.[161]  Furthermore, factual assertions such as those Forrer alleges make little difference as a legal matter when considering the constitutionality of a statute on its face. Instead, this is an example of a case that presents no material factual dispute and can be resolved purely through the exercise of legal reasoning.  It was proper here for the superior court to disregard Forrer's alleged "facts" and rule on the motion to dismiss without converting it into a motion for summary judgment.

B. **HB 331 Contracts "State Debt" Prohibited By Article IX, Section 8.**

1. **Subject-to-appropriation bonds are contrary to the plain text of the Alaska Constitution and the framers' intent.**

Our first step when presented with a question of constitutional law not squarely addressed by precedent is to consult the plain text of the Alaska Constitution as clarified through its drafting history.[162]  Article IX, section 8 provides:

> No state debt shall be contracted unless authorized by law for capital improvements or unless authorized by law for housing loans for veterans, and ratified by a majority of the qualified voters of the State who vote on the question.  The State may,

---

[160] For example, Forrer claims that it was error for the superior court not to accept his allegation that "[t]he bonds created by HB 331 establish an obligation . . . to pay money to bond holders in the future."  Whether the bonds authorized by HB 331 create an obligation is a matter of statutory interpretation — a question of law, not fact. *See In re Hospitalization of Paige M.*, 433 P.3d 1182, 1186 (Alaska 2018), *reh'g withdrawn* (Feb. 4, 2019).  The superior court was correct to disregard Forrer's conclusory statements.

[161] *See* Alaska R. Civ. P. 12(b); *Martin v. Mears*, 602 P.2d 421, 426 n.5 (Alaska 1979).

[162] *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017) (quoting *Hickel v. Cowper*, 874 P.2d 922, 926 (Alaska 1994)).

as provided by law and without ratification, contract debt for the purpose of repelling invasion, suppressing insurrection, defending the State in war, meeting natural disasters, or redeeming indebtedness outstanding at the time this constitution becomes effective.[163]

We do not interpret constitutional provisions in a vacuum — the document is meant to be read as a whole with each section in harmony with the others.[164] Terms and phrases chosen by the framers are given their ordinary meaning as they were understood at the time,[165] and usage of those terms is presumed to be consistent throughout.[166] Although we may look to other jurisdictions' experiences with interpreting similar constitutional terms,[167] each state constitution's debt provisions are different and must be interpreted

---

[163] Alaska Const. art. IX, § 8.

[164] *Cf. Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 528 (Alaska 1993) ("Whenever possible, this court interprets each part or section of a statute with every other part or section, so as to create a harmonious whole."); 73 AM. JUR. 2D *Statutes* § 96, Westlaw (database updated May 2020); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167-69 (2012) (whole-text canon); *id.* at 180-82 (harmonious-reading canon). While these are canons of *statutory* construction, we have recognized that "[t]he basic principles for interpreting statutes apply to constitutions." *Thomas v. Bailey*, 595 P.2d 1, 4 (Alaska 1979).

[165] *Hickel*, 874 P.2d at 926; *see also Citizens Coal. for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 169 (Alaska 1991) (relying on a 1966 dictionary to determine the plain meaning of article XI, section 7).

[166] *See Fancyboy v. Alaska Vill. Elec. Coop., Inc.*, 984 P.2d 1128, 1133 (Alaska 1999) ("We assume as a rule of statutory interpretation that the same words used twice in the same statute have the same meaning."); SCALIA & GARNER, *supra* note 164, at 170-73 (presumption of consistent usage).

[167] *See Citizens Coal. for Tort Reform*, 810 P.2d at 166-67.

in light their purpose and relevant history.[168]  Legal dictionaries and treatises also recognize that

> [t]he word "debt," appearing in a constitution or statute fixing a debt limit for municipalities, does not have a fixed legal signification but is used in different statutes and constitutions in senses varying from a very restricted to a very general signification. Its meaning, therefore, in any particular statute or constitution is to be determined by construction.[169]

The Alaska Constitution does not define the term "debt" as used in article IX, unlike some other state constitutions that explicitly limit the term to those obligations backed by the state's "full faith, credit and taxing powers."[170]  But the text of section 8 identifies two primary characteristics of "debt":  (1) the debt must be "contracted," implying a volitional act, potentially involving a contract or other promise of repayment; and (2) it must be for a specific "purpose," only a handful of which are permissible.[171]  Whether the State's "full faith and credit" is pledged is not an express consideration.[172]

Section 10 sheds further light on the contours of section 8:  "The State and its political subdivisions may *borrow money* to meet appropriations for any fiscal year in anticipation of the collection of the revenues for that year, but *all debt so contracted*

---

[168]    *See id.* at 170 (citing *Thomas*, 595 P.2d at 4).

[169]    *Debt*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969); *accord* 56 AM. JUR. 2D *Municipal Corporations, Etc.* § 526, Westlaw (database updated May 2020).

[170]    Minn. Const. art. XI, § 4; *see also* Haw. Const. art. VII, § 12; Or. Const. art. XI-Q, § 2(2); Wash. Const. art. VIII, § 1(d).

[171]    *See* Alaska Const. art. IX, § 8.

[172]    *See Hickel v. Cowper*, 874 P.2d 922, 927-28 (Alaska 1994) ("We are not vested with the authority to add missing terms or hypothesize differently worded provisions in order to reach a particular result.").

shall be paid before the end of the next fiscal year."[173] Section 10 provides the sole

means for the legislature to borrow funds for any purpose — not just those enumerated

in section 8 — but with the strict caveat of repayment within a year.

Section 11 adds one final parameter to the constitutional meaning of "debt":

The restrictions on contracting debt do not apply to debt incurred through the issuance of revenue bonds by a public enterprise or public corporation of the State or a political subdivision, when the only security is the revenues of the enterprise or corporation. The restrictions do not apply to indebtedness to be paid from special assessments on the benefited property, nor do they apply to refunding indebtedness of the State or its political subdivisions.[174]

Again, the act of "contracting debt" explicitly includes "the issuance of . . . bonds," aside

from the narrow exception of "revenue bonds."[175] Section 11 also exempts "refunding

indebtedness" previously contracted under section 8.[176] Where section 10 provides a

---

[173]    Alaska Const. art. IX, § 10 (emphasis added).

[174]    *Id.* art. IX, § 11.

[175]    The fact that only "revenue bonds" are specifically excluded likewise suggests that all other types of bonds are included under the maxim of *expressio unius est exclusio alterius*. *See Alaska State Comm'n for Human Rights v. Anderson*, 426 P.3d 956, 964 n.34 (Alaska 2018).

[176]    The State argues that the term "indebtedness" is broader than "state debt" and should encompass any "unavoidable, pre-existing financial obligation of the State." The only concrete example of "indebtedness" from the text is that of "special assessments on the benefited property" — in other words, local taxes levied on properties within a service area. *See generally Fink v. Municipality of Anchorage*, 424 P.3d 338 (Alaska 2018) (discussing special assessments for roads and sewers). A municipality's power to establish a "service area" and "levy[] . . . assessments" flows directly from the constitution. Alaska Const. art. X, § 5 (organized boroughs); *see also id.* § 6 (granting the legislature the same power over unorganized boroughs). Thus the term
(continued...)

narrow exception to section 8's limits on permissible purposes, section 11 clarifies that revenue bonds and certain types of non-volitional obligations are not "debt" proscribed by article IX, section 8.

The debt provisions in article IX thus form a cohesive whole, with sections 10 and 11 providing narrow exceptions to the blanket restriction in section 8.[177] This interpretation comports with how Delegates discussed these provisions,[178] as well as their broader understanding of "debt" as "borrow[ed] money,"[179] usually in the context of issuing bonds.[180] In *Village of Chefornak v. Hooper Bay Construction Co.*, we likewise held that article IX, section 9's restrictions on local debts "are applicable only where a political subdivision has endeavored to borrow money, via the issuance of bonds or other

---

[176]  (...continued)
"indebtedness" at most also encompasses sums the State owes through the operation of other constitutional provisions. *See, e.g.*, *Vill. of Chefornak v. Hooper Bay Constr. Co.*, 758 P.2d 1266, 1270 (Alaska 1988) (holding that court-ordered money judgment was not "contracting debt" for purposes of article IX, section 9). The controversy before us does not present such a situation, so we need not address the scope of this exception.

[177]  Because these exceptions apply to different aspects of section 8, they appear to be mutually exclusive. In other words, the legislature could not borrow unlimited funds under section 10, then restructure the resulting debt under section 11 to circumvent section 10's one-year repayment requirement.

[178]  *See, e.g.*, 2 PACC 1112 (Dec. 19, 1955) (statement of Del. Frank Barr) ("[T]he people are the ones that put the limit on any public debt . . . .").

[179]  *Id.* (statement of Del. Maurice T. Johnson).

[180]  *See, e.g.*, 3 PACC 2302 (Jan. 16, 1956) (statement of Del. Leslie Nerland) ("[T]he contracting of bonded indebtedness . . . should in each case be approved by a majority of the qualified voters . . . .").

paper indebtedness."[181] We noted at the time "that every previous Alaska case involving section 9 . . . [or its] parallel constitutional provision applicable to state debts has concerned bonding issues."[182] We concluded that "a judgment entered upon a settlement stipulation" did not fall under the article IX restrictions against contracted debt.[183] *Carr-Gottstein Properties v. State* likewise interpreted " 'debt' as a term of art used to describe an 'obligation' involving borrowed money" in upholding a lease-purchase agreement where there was no "promise to pay . . . rents accruing in the future."[184] As we explain below, HB 331 also fails to satisfy the *Carr-Gottstein* three-prong test for constitutionally permissible "debt."

Against this background the State argues that the Delegates' silence on "subject-to-appropriation debt" evinces an intent to not prohibit new "forms of debt." The State selectively cites passages from the Constitutional Convention debates to support its narrower understanding of "debt" as encompassing only "bonds pledging the 'full faith and credit of the state.' " As discussed above, we look to the Delegates' debates and statements in interpreting the constitution.[185] Undercutting the State's

---

[181]    758 P.2d at 1270.

[182]    *Id.* at 1269.

[183]    *Id.* at 1269-70.

[184]    899 P.2d 136, 142 (Alaska 1995) (per curiam) (quoting Bisk, *supra* note 17, at 537).

[185]    *See, e.g.*, *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 92-95 (Alaska 2016) (reviewing Delegates' debate over state-local cooperative programs to determine constitutionality); *Sonneman v. Hickel*, 836 P.2d 936, 938-39 (Alaska 1992) (giving particular weight to Delegate White's statements for intent of article IX, section 7, as he was "the spokesman for the committee which drafted [that] section"); *Abood v. League of Women Voters of Alaska*, 743 P.2d 333, 341-43 (Alaska 1987) (considering Delegates'
(continued...)

argument, there was only a single, passing mention of the phrase "full faith and credit" during the Constitutional Convention, and it appeared in the context of a debate concerning voter requirements for statewide bond elections:

> The *full faith and credit* of the state is explained on every bond issue, and that is a debt service that applies to all taxpayers . . . , and I don't think that we want to compel a registration of all property within the state . . . just in order to have a tax roll so people can be qualified to vote as property owners in statewide elections. I think everybody should vote in a statewide election.[186]

Delegates knew that other state constitutions defined "debt" to include full faith and credit,[187] but omitted such language. As we mentioned before, the Delegates had a wide array of opinions on the meaning of "debt," ranging from general obligation bonds to all borrowed money, or even any act that might impugn the State's credit.[188] It should come as no surprise, therefore, that neither *Chefornak* nor *Carr-Gottstein* mentioned "full faith and credit" when discussing "debt" in the article IX context.[189]

---

[185]    (...continued)
own policy on closed meetings to deny implied constitutional right of public access to legislative meetings).

[186]    3 PACC 2346 (Jan. 16, 1956) (statement of Del. Ralph J. Rivers) (emphasis added). Because Delegate Ralph J. Rivers was not a member of the Committee on Finance and Taxation, see 6 PACC App. V at 104 (Dec. 16, 1955), this passing reference is afforded no greater weight than the varied opinions of the other Delegates.

[187]    *See* DELEGATE HANDBOOK, *supra* note 22, at 4-5 (noting that Delegates were provided copies of all state constitutions, including those proposed for Hawaii and Puerto Rico).

[188]    *See supra* Part II.B.

[189]    We have used the phrase "full faith, credit and resources" only once before
(continued...)

In support of its narrow interpretation of "debt," the State cites past decisions in which we considered dispositive whether the State's credit was pledged. But the State misconstrues our precedents. In *DeArmond v. Alaska State Development Corp.*, we considered a constitutional challenge against one of the first Alaska corporations created to issue revenue bonds.[190] Of primary concern was whether the legislature's start-up loan to the bond-issuing corporation and the corporation's use of expected bond proceeds was a use of "public funds" or "public credit" that was not "for a public purpose" as required by article IX, section 6.[191] Because the corporation clearly served a public purpose, and because the challenged revenue bonds were "backed only by the resources and credit of the corporation," we held that "[t]he credit of the state is not being pledged."[192] We said nothing of article IX, section 8. *Walker v. Alaska State Mortgage Ass'n* also involved revenue bonds, but the challenge included a claim under article IX, section 8.[193] The bulk of argument revolved around other constitutional

---

[189]    (...continued)
in our decisions regarding state debt, and that was because the language itself appeared in the text of the bonding proposition at issue. *See Thomas v. Rosen*, 569 P.2d 793, 798 (Alaska 1977) (Boochever, C.J., dissenting). The State likewise argues that our reasoning in *Thomas* supports its position, but that case involved a gubernatorial veto to reduce the total amount of general obligation bonds the legislature submitted to the voters for approval. *Id.* at 794 (majority opinion).

[190]    376 P.2d 717, 719-20 (Alaska 1962).

[191]    *Id.* at 721; Alaska Const. art. IX, § 6 ("No tax shall be levied, or appropriation of public money made, or public property transferred, *nor shall the public credit be used*, except for a public purpose." (emphasis added)).

[192]    *DeArmond*, 376 P.2d at 722.

[193]    416 P.2d 245, 253 (Alaska 1966). Although we did not use the term "revenue bond" in *Walker*, we upheld the challenged bonds as being "backed only by the
(continued...)

provisions[194] and we dismissed the section 8 challenge with very little discussion, noting only that "our holding in *DeArmond* is controlling here."[195]

The State reads much into these two cases, but it overlooks the fact that both concerned revenue bonds with dedicated revenue streams — not "subject-to-appropriation" bonds — and our constitution contains a specific, limited exception for revenue bonds.[196] *DeArmond*'s statements on "credit," accordingly, are concerned only with the "public purpose" clause of section 6, and *Walker*'s statements on "debt" merely reflect the understanding that revenue bonds are a constitutional exception to the constitutional restriction on debt. *DeArmond* and *Walker* would be relevant here only if the bonds issued pursuant to HB 331 qualified as "revenue bonds." We address that alternative argument further below, but for obvious reasons, we hold they are not.

Instead, the argument the State would have us adopt to uphold HB 331 relies on logic the framers resoundingly rejected. Rather than strict application of the procedures mandated by article IX, section 8, the State contends that the "preservation

---

[193]     (...continued)
resources and credit of the corporation." *Id.* In so deciding, we cited *DeArmond* and a handful of cases from other jurisdictions unambiguously discussing revenue bonds. *See Orbison v. Welsh*, 179 N.E.2d 727, 737-38 (Ind. 1962); *Sigman v. Brunswick Port Auth.*, 104 S.E.2d 467, 469 (Ga. 1958); *State ex rel. Thomson v. Giessel*, 60 N.W.2d 873, 877 (Wis. 1953); *cf. Book v. State Office Bldg. Comm'n*, 149 N.E.2d 273, 283-84 (Ind. 1958) (upholding lease-purchase agreements under revenue bond theory). We further note that the Association's enabling act clearly provided a means of producing revenue, i.e., the sale of mortgages, and directed any bonds to be made "payable out of any revenues or monies of the Association." Ch. 103, § 8, SLA 1961.

[194]     *See Walker,* 416 P.2d at 249-53 (discussing Alaska Const. art. III, §§ 22, 26; *id.* art. IX, § 6).

[195]     *Id.* at 253.

[196]     *See* Alaska Const. art. IX, § 11.

of annual discretion in elected representatives is sufficient to effectuate the policies underlying debt limitations." The State apparently forgets that the Delegates considered and rejected just such an amendment that would have permitted the legislature to create debt with a two-thirds vote.[197] We struggle to comprehend why we should judicially create such a power now but checked only by a simple majority vote. The State also makes the argument that "modern financial markets provide their own separate check on imprudent borrowing, because interest rates reflect the affordability of debt for a borrower and the risk of nonpayment." But our constitution already identifies who holds the final check against imprudent borrowing: the people.[198] Delegates discussed similar interest rate arguments surrounding the aforementioned two-thirds debt amendment.[199]

---

[197]    *See* 4 PACC 2421-38 (Jan. 17, 1956).

[198]    Alaska Const. art. IX, § 8 (requiring all "state debt" to be "ratified by a majority of the qualified voters of the State who vote on the question"); *see also* 2 PACC 1112 (Dec. 19, 1955) (statement of Del. Barrie M. White) (explaining that "no dollar debt limitation" was deemed necessary because section 8 required all "ordinary debts be submitted to the voters for approval"); 4 PACC 2434 (Jan. 17, 1956) (statement of Del. Barrie M. White) ("[A] bond proposal to the people via referendum is the greatest way . . . to insure that the credit of the state will not be impaired.").

[199]    *See* 4 PACC 2435-36 (Jan. 17, 1956) (statement of Del. Victor Fischer) (describing how bond markets dictate interest rates based on "the ability to repay and the faith that the bond payers have in the governmental entity," and arguing that the public referendum requirement would compel the legislature to "sell[] bonds to establishments and separate corporations," thereby "forcing a much higher interest rate on the taxpayers of Alaska"). *But see id.* at 2436-37 (statement of Del. Barrie M. White) ("[I]f bonding the state via a special authority should result in higher interest rates, that is merely an added inducement to go back to the referendum where such issues ought to be."). Notably this back-and-forth centered on the wisdom of revenue bonds, which are explicitly permitted under article IX, section 11 — at no point did any Delegate intimate that higher interest rates *alone* would suffice to protect the State's credit against imprudent bonding schemes.

Committee on Finance and Taxation Chair Leslie Nerland's comments on this issue are instructive:

> Allowing two methods by which a state or political subdivision may provide for bonded indebtedness cannot help but cause favoritism by the bond investment houses for one method or the other, and I think there is no doubt but that this would result eventually in the bonds of the state being classed into two different categories and there is not much question . . . which issue would take the lowest interest rate. . . . [P]utting these two methods implies that we are trying to seek out the most expedient way at the time that the bond issue was required . . . [which] would eventually result in two classifications on general obligations of the State of Alaska . . . .[200]

The framers adopted this reasoning,[201] but the State now attempts to seek the opposite — sanctioning subject-to-appropriation bonds would create "two classifications" of bonded indebtedness under very different interest rates, solely for the sake of legislative expedience. Where the framers expressly considered and rejected the State's line of logic, we cannot in good conscience adopt it a mere six decades after-the-fact.

We need not formulate a bright-line test to delineate "debt" from "non-debt" in this instance. The plain text of the constitution and the Delegates' unambiguous rejection of the State's arguments control our decision today. As the State points out, rejecting its position "would prevent the State from ever engaging in this kind of financing" as the intended purpose — to facilitate the purchase of oil and gas exploration tax credits — is not one permitted under article IX, section 8.[202] This may be true, but

---

[200]    *Id.* at 2434-35 (statement of Del. Leslie Nerland).

[201]    *Id.* at 2437-38 (striking the two-thirds language by a vote of 29-19).

[202]    Alaska Const. art. IX, § 8 (limiting types of debt permitted by referendum
(continued...)

we have no power to rewrite constitutional provisions "no matter how clearly advantageous and publicly supported" a policy may appear to be. Only section 10 permits the contracting of short-term debt without restriction on purpose,[203] but the State has expressly rejected any reliance on that provision. If the State intends to utilize financing schemes similar to HB 331 in the future, it must first seek approval from the people — if not through a bond referendum then through a constitutional amendment.[204] Although we hold the constitution's debt restriction unambiguously prohibits the bonding scheme here, we address the State's other arguments below to reaffirm our conclusion.

### 2. The subject-to-appropriation bonds established by HB 331 do not satisfy our test from *Carr-Gottstein*.

Both Forrer and the State rely heavily on competing interpretations of the framework for "state debt" we announced in *Carr-Gottstein Properties v. State*.[205] In *Carr-Gottstein* we affirmed in a three-sentence per curiam opinion a superior court ruling upholding the constitutionality of one particular lease-purchase agreement;[206] we then

---

[202]   (...continued)
to "capital improvements" and "housing loans for veterans").

[203]   *Id.* art. IX, § 10 (permitting interim borrowing "to meet appropriations" but requiring "all debt so contracted [to] be paid before the end of the next fiscal year"). It may be possible to restructure HB 331 in such a way as to rely entirely on section 10, but we decline to hypothesize what such a bonding scheme would look like or whether it would be as financially advantageous.

[204]   *See id.* art. XIII, § 1.

[205]   899 P.2d 136 (Alaska 1995) (per curiam).

[206]   *Id.* at 137.

attached two of the superior court's orders as appendices.[207] The controversy involved a contract for the Alaska Court System to lease a property from the Alaska Department of Natural Resources (DNR), with a purchase option upon conclusion of the lease.[208] The building was owned by a private entity.[209] DNR assigned its rights to a bank as trustee, which then sold certificates of participation as negotiable instruments entitling holders to a percentage share of the lease payments.[210] Lease payments were to be made biannually from legislative appropriations,[211] subject to "a non-appropriation clause and other terms which limit the recourse of the [certificate] holders to the leased property."[212] The State asserted that in the event of non-appropriation "it would not 'forfeit' its equity; instead, it would . . . receive the surplus proceeds of the sale or reletting of the property after paying the outstanding principal owed under the lease."[213]

---

[207] *Id.* at 137 n.1.

[208] *Id.* at 138.

[209] *Id.*

[210] *Id.*

[211] *Id.*

[212] *Id.* at 144.

[213] *Id.* at 141. The *Carr-Gottstein* court did not find the issue of losing equity significant, noting that in *Norene v. Municipality of Anchorage*, 704 P.2d 199 (Alaska 1985), we "approve[d] of lease-purchase agreements as a threshold matter," even though "the municipality would lose its equity in leased land if it decided not to purchase the property at the end of the lease." *Carr-Gottstein*, 899 P.2d at 142. We now disavow this characterization. Our decision in *Norene* concerned whether the "land swap" in question met the definition of a lease-purchase agreement under Anchorage Municipal Code 25.20.060. 704 P.2d at 202-03. *Norene* did not involve a constitutional challenge, and we did not attempt to fashion a constitutional definition of lease-purchase agreements.
(continued...)

To determine whether the lease-purchase agreement was permissible under article IX, section 8, the superior court surveyed Alaska precedent on constitutional "debt,"[214] analogous cases from other jurisdictions,[215] and a student-written law review note.[216] It ultimately formulated a three-prong test: "The court upholds the lease agreement in the case at bar where the lease (1) contains a non-appropriation clause; (2) limits recourse to the leased property; and (3) does not create a long-term obligation binding future generations or Legislatures."[217] The court unfortunately sowed some confusion with its additional comment that "[w]here a lease-purchase agreement does not require a future legislature to appropriate funds, the agreement is not a long-term binding obligation to repay borrowed money pursuant to article IX, section 8, and is not 'debt'

---

[213]    (...continued)
Nor did *Norene* involve borrowing instruments — the funds involved came straight from appropriations, the lease was for only one year, and the dispositive issue was whether the whole transaction was valued at more than $1 million.  Id.

[214]    *Carr-Gottstein*, 899 P.2d at 141-42 (first discussing *DeArmond v. Alaska State Dev. Corp.*, 376 P.2d 717 (Alaska 1962); then discussing *Walker v. Alaska State Mortg. Ass'n*, 416 P.2d 245 (Alaska 1966); then discussing *Norene*, 704 P.2d at 199; and then discussing *Vill. of Chefornak v. Hooper Bay Constr. Co.*, 758 P.2d 1266 (Alaska 1988)).

[215]    *Id.* at 141 (discussing *Book v. State Office Bldg. Comm'n*, 149 N.E.2d 273 (Ind. 1958); then discussing *State ex rel. Thomson v. Giessel*, 72 N.W.2d 577 (Wis. 1955)).  The court also noted that 21 other states permitted lease-purchase agreements under their constitutions.  *Id.* at 143 n.7.

[216]    *See id.* at 142 (quoting Bisk, *supra* note 17, at 537).

[217]    *Id.* at 144 (citing generally Bisk, *supra* note 17).

as defined by the Alaska Supreme Court."[218] The superior court here likewise found this language confusing and circuitous.[219]

The State essentially argues for a two-part test, combining *Carr-Gottstein*'s first and third prongs into a single question — whether repayment of borrowed money is "subject to appropriation" — and rephrasing the second prong as whether there is "recourse against the State on default."[220] In contrast, Forrer argues that the *Carr-Gottstein* test implicitly contained a fourth prong limiting its application to lease-purchase agreements.[221] The State's reformulation is not convincing. The *Carr-Gottstein* court would not have included a third prong if it did not think it was necessary. Nor is it immediately apparent to us why *Carr-Gottstein*'s reasoning cannot extend beyond lease-purchase agreements. But we decline the State's invitation to eliminate any

---

[218] *Id.* at 142-43 (footnote omitted).

[219] The superior court sought clarification from the parties during oral argument several times: "Regarding those three factors . . . aren't No. 1 and 3 the same? . . . [I]t contains a non-appropriation clause, and that's No. 1. No. 3 does not create long-term obligation binding future generations or legislatures. Isn't that what a non-appropriation clause does?" "I think those first and third factors are the same thing."

[220] The State draws on the "term of art" language that *Carr-Gottstein* used to describe the word "debt" as it appears in the constitution. 899 P.2d at 142. Relying on that phrase, the State argues that although subject-to-appropriation bonds "are a kind of 'debt,' they are not 'state debt' . . . because they are subject to appropriation, and bondholders have no recourse against the State on default."

[221] Forrer argues that *Carr-Gottstein* created only a "narrow judicially wrought exception" based on considerations unique to the context of lease-purchase agreements. He contends that "the borrowing of money is significantly different than entering into a lease-purchase agreement," noting that bondholders would have "no recourse to property" and failing to appropriate funds would negatively impact Alaska's credit rating, effectively "bind[ing] future legislatures." HB 331 therefore fails on multiple prongs of Forrer's *Carr-Gottstein* test.

of the three prongs — it is abundantly clear that the *Carr-Gottstein* court did not find a non-appropriation clause alone sufficient to uphold the lease-purchase agreement involved as constitutional. We look to the sources cited and specific facts discussed in *Carr-Gottstein* for assistance as we address each prong in turn.

The first prong is formalistic in nature and merely asks whether a subject-to-appropriation clause exists in the challenged contract or legislation.[222] There is little dispute that the first prong is met: the bonds are repeatedly referred to by the parties as "subject-to-appropriation" and HB 331 is replete with disclaimers stating as much.[223]

The second prong requires the challenged arrangement to "limit[] recourse to the leased property."[224] The *Carr-Gottstein* court reasoned that a corporation's "independent nature" was not dispositive, but it placed substantial value on the fact that the lease-purchase agreement contained "other terms which limit the recourse of the

---

[222]     Although the *Carr-Gottstein* court appeared to rely heavily on a student note for its test, 899 P.2d at 144 & n.10, the student note's proposed three-prong test bears little resemblance: "Does there exist an unconditional obligation extending beyond the current fiscal year? Does failure to appropriate funds in the future subject the government entity to suit? Are other government assets ultimately subject to claim?" Bisk, *supra* note 17, at 544-45. The student note concludes that "[w]here a valid nonappropriation mechanism is present, the answer to all of the above questions is negative — no debt is created." *Id.* at 544. If the *Carr-Gottstein* court intended to adopt this test verbatim then it would have. *Compare id.* at 544-45, *with Carr-Gottstein*, 899 P.2d at 144. Instead, the court fashioned its own three-prong test relying on the specific context presented before it, i.e., that the agreement "contain[ed] a non-appropriation clause and other terms which limit the recourse of the [certificate] holders to the leased property." *Carr-Gottstein*, 899 P.2d at 144.

[223]     *See* AS 37.18.030(c); AS 37.18.040(g).

[224]     *Carr-Gottstein*, 899 P.2d at 144.

[certificate] holders to the leased property."[225]  The property in question was privately owned, although the title was held by DNR as lessor.[226]  Because the property was not a state asset, the State would not be liable in the event of non-appropriation, and any outstanding payments to certificate holders could be sought from the sale or reletting of the building.[227]  The State appears to believe that this factor is satisfied because HB 331 "limits recourse even further" by the fact that there is no property, only a nominally independent corporation.[228]  But that is not what the *Carr-Gottstein* test explicitly requires:  recourse must be constrained to an identifiable asset that is not government-owned.  Even proceeding under the assumption that the lack of a tangible res is not fatal to this analysis, HB 331 provides that bondholders' sole recourse *is* to government assets, i.e., legislatively appropriated funds, held by the Corporation.[229]  Thus the State fails to meet the second prong of the *Carr-Gottstein* test.

The third prong finally asks whether there exists a long-term obligation.[230]  Relying on the student note cited by the *Carr-Gottstein* court, we consider whether the challenged arrangement "extend[s] beyond the current fiscal year," and whether failing

---

[225]  *Id.*

[226]  *Id.* at 138.

[227]  *Id.* at 141.

[228]  But legislators found this point far from reassuring, instead expressing concern that HB 331 created little more than a "sham corporation" with "zero revenue." S. Floor Deb. on C.S.H.B. 331, *supra* note 88, at 3:59 (statement of Sen. Bill Wielechowski); *see also* AS 37.18.020 (designating three executive branch commissioners as the Corporation's board of directors).

[229]  AS 37.18.070.

[230]  *Carr-Gottstein*, 899 P.2d at 144.

to appropriate subjects the lessee to suit where "government assets" can be seized.[231] In *Carr-Gottstein* there was no long-term obligation on the legislature to make annual appropriations because the penalty for non-appropriation was termination of the lease agreement and reversion of the property to the lessor.[232] But here, the Corporation's sole function is to borrow money over several years to facilitate the purchase of existing oil and gas tax credits rather than permit those credits to be applied to future oil production taxes.[233] HB 331's very purpose, then, is to create a long-term obligation even though there was none previously. The *Carr-Gottstein* court's reasoning on this prong is particularly evident in its rejection of the argument that the lease-purchase agreement created an " 'equitable, moral or contingent' duty to appropriate funds," specifically because the State would "not lose all equity upon termination of the agreement."[234] Forrer thus contends that HB 331 fails under this prong as future legislatures would feel enormous pressure to appropriate funds due to the potential negative impact on Alaska's credit rating. The State does not dispute this characterization; instead it rationalizes that the lease-purchase agreement approved in *Carr-Gottstein* would also have resulted in a

---

[231]  Bisk, *supra* note 17, at 544-45. We again note the differences between these tests, as the student note required such obligations to be "unconditional," *id.* at 544, whereas the *Carr-Gottstein* court conspicuously omitted such language. 899 P.2d at 144.

[232]  *Carr-Gottstein*, 899 P.2d at 142-44; *see also* RESTATEMENT (SECOND) OF PROPERTY, LAND. & TEN. § 10.1 (AM. LAW INST. 1977).

[233]  The State characterizes the Corporation's purpose as replacing these tax credits with subject-to-appropriation bonds to amortize the State's financial obligations and ensure greater predictability in oil tax revenues. *See* Minutes, *supra* note 86, at 18, 21-24 (statements of Sheldon Fisher, Comm'r, Dep't of Revenue). But the State was never *obligated* to purchase these tax credits in the first place.

[234]  *Carr-Gottstein*, 899 P.2d at 144 n.9 (distinguishing *Montano v. Gabaldon*, 766 P.2d 1328 (N.M. 1989)).

credit downgrading if the non-appropriation clause were exercised. But the *Carr-Gottstein* court did not consider the State's credit rating in its decision — instead, as far as the court was concerned, no adverse consequences would result from non-appropriation and the legislature was truly free to exercise its discretion. In the procedural posture presented here, Forrer's factual allegations are presumed true. We need not decide whether a potential credit downgrade alone suffices to create debt — what matters is that this fact precludes the State from succeeding on *Carr-Gottstein*'s third prong. The State's goal of spreading out its financial obligations is a reasonable one, but the means it chose violates both article IX, section 8, and multiple prongs of the *Carr-Gottstein* test.

3. **The cases from other jurisdictions cited in support of permitting subject-to-appropriation bonds are unpersuasive.**

In support of its narrower interpretation of our constitutional debt restriction, the State resorts to decisions of other jurisdictions for persuasive authority. The State relies heavily on a 32-case string citation of court decisions supporting the so-called majority view in *Lonegan v. State* (*Lonegan II*).[235] But the vast majority of those cases concern revenue bonds, lease-purchase agreements, or the construction or maintenance of some sort of physical property, and *none* of them concern the type of solely appropriation-backed bonds contemplated by HB 331.[236] Revenue bonds are permitted outright under article IX, section 11, and we have already indicated our

---

[235]     819 A.2d 395, 404 n.2 (N.J. 2003) (4-3 decision).

[236]     From our perspective, only four of the cited cases involve non-revenue-producing projects — mostly for road construction — for which subject-to-appropriation bonds could be described as "moral obligations." *See Wilson v. Ky. Transp. Cabinet*, 884 S.W.2d 641, 642-44 (Ky. 1994); *Schulz v. State*, 639 N.E.2d 1140, 1149 (N.Y. 1994); *In re Okla. Capitol Improvement Auth.*, 958 P.2d 759, 776 (Okla. 1998); *Dykes v. N. Va. Transp. Dist. Comm'n*, 411 S.E.2d 1, 9-10 (Va. 1991) (on rehearing).

approval of subject-to-appropriation lease-purchase agreements as noted above.[237]  We briefly explain why the cases provided by the State fail to persuade us.

*Lonegan II* concerned a constitutional challenge to revenue bonds for education facilities.[238]  A narrow majority issued broad pronouncements on what constitutes debt for purposes of the New Jersey Constitution,[239] but to rely on those statements is to ignore the unique factual scenario.[240]  Of equal concern in *Lonegan II* was that the legislature had already extensively relied on subject-to-appropriation bond financing for the state's fiscal policy.[241]  The court explained that attempting to create rules "at this late date . . . could have unintended consequences,"[242] and it was "unwilling

---

[237]    The State relies on *Schowalter v. State*, 822 N.W.2d 292 (Minn. 2012), but that case concerned bonds relying exclusively on tobacco settlement revenues — the Alaska legislature enacted a similar arrangement, which we upheld as a revenue bond in *Myers v. Alaska Hous. Fin. Corp.*, 68 P.3d 386, 393-94 (Alaska 2003).

[238]    819 A.2d at 397.

[239]    *Id.* at 402 ("Under our case law, only debt that is legally enforceable against the State is subject to the Debt Limitation Clause."); *id.* at 407 ("We . . . agree with the majority of state courts interpreting their own constitutions that the restrictions of the Debt Limitation Clause do not apply to appropriations-backed debt.").  Three of the seven justices dissented.  *See id.* at 407 (Long, Verniero, and Zazzali, JJ., dissenting).

[240]    The same court concluded earlier in the litigation that debt authorized for educational purposes — the lawsuit's primary target — was "*sui generis*" due to constitutional provisions on school funding that "separately authorize[] state-backed school bonds without reference to the Debt Limitation Clause." *Lonegan I*, 809 A.2d 91, 105-06 (N.J. 2002).

[241]    *Lonegan II*, 819 A.2d at 401-02.

[242]    *Id.* at 397.

to disrupt the State's financing mechanisms."[243]  The dissent pointed out that three-fourths of New Jersey's debt was subject-to-appropriation, totaling nearly $11 billion.[244] Any default on its obligations to appropriate funds would thus have resulted in "severe and unacceptable harm to New Jersey's credit rating."[245]  If anything, New Jersey's example in this arena counsels greater caution, not blind imitation.

*Fults v. City of Coralville* involved revenue bonds for construction and urban renovation.[246]  The challenged urban renewal area was expected to "provide sufficient revenue to fund the project" by increasing the value of the property tax base,[247] and the city issued subject-to-appropriation bonds to finance the construction of a hotel to achieve those ends.[248]  This arrangement was challenged by property owners alleging, *inter alia*, that the "bonds caused the city to exceed its constitutional debt limit."[249]  In rejecting an "argument that the city [was] attempting to do indirectly what it may not do directly," the court relied on a Utah case to claim that "[i]f the express terms of the city's agreement do not offend the constitution, then the purpose alone will not render the agreement unconstitutional."[250]  However, the reasoning of the Utah case cited for that

---

[243]     *Id.* at 407.

[244]     *Id.* at 409 (Long, Verniero, and Zazzali, JJ., dissenting).

[245]     *Id.*

[246]     666 N.W.2d 548, 551 (Iowa 2003).

[247]     *Id.* at 551 n.1.

[248]     *Id.* at 551.

[249]     *Id.* at 552.

[250]     *Id.* at 558-59 (citing *Mun. Bldg. Auth. of Iron Cty. v. Lowder*, 711 P.2d 273, 280 (Utah 1985)).

point is not reassuring: "Of course the Act is intended to permit avoidance of the constitutional debt limitations. It is the very rigidity of those limitations that has led the courts to narrowly construe them and the legislature to actively assist local government in avoiding them."[251]

The State additionally discusses *In re Oklahoma Capitol Improvement Authority*[252] and the New York case *Schulz v. State*[253] in its briefing,[254] both of which involved bonds for transportation projects to be paid for via dedicated revenue streams from increased transportation taxes and fees.[255] While these cases thus more closely resemble revenue bonds, this type of dedicated funding is explicitly prohibited under our constitution.[256] We cannot help but note that constitutional lines between revenue bonds, lease-purchase agreements, and subject-to-appropriation bonds have been blurred in many jurisdictions due to incremental legislative experimentation and successive judicial application of stare decisis.[257] Regardless, the transportation and construction bond

---

[251]    *Lowder*, 711 P.2d at 279-80.

[252]    958 P.2d 759 (Okla. 1998).

[253]    639 N.E.2d 1140 (N.Y. 1994).

[254]    The State also mentions *Dep't of Ecology v. State Fin. Comm.*, 804 P.2d 1241 (Wash. 1991), but that case concerned only lease-purchase agreements, *id.* at 1242, and does nothing to advance the State's argument here.

[255]    *See In re Okla. Capitol Improvement Auth.*, 958 P.2d at 764; *Schulz*, 639 N.E.2d at 1142.

[256]    *See* Alaska Const. art. XI, § 7.

[257]    *See, e.g.*, *Lonegan II*, 819 A.2d 395, 397 (N.J. 2003) (4-3 decision) (relying on "over fifty years of precedent" and "the need to maintain stability" to uphold subject-to-appropriation bonds); *Schulz v. State*, 606 N.Y.S.2d 916, 921 (N.Y. App. Div. 1993)

(continued...)

contexts at least present something with revenue-generating potential with which to retire bonds should the legislature fail to appropriate funds.[258] This case is immediately distinguishable from any others cited by the State — there is no res. Bondholders under HB 331 ostensibly hold promises of payment from little more than a shell corporation of the State.

### C. The Superior Court Correctly Concluded That HB 331 Did Not Qualify For Any Other Exceptions To "State Debt" In Article IX.

In the alternative, the State argues that HB 331 fits within one or both of the exceptions under article IX, section 11. The superior court rejected those claims, and we agree that the State's arguments are unfounded.

#### 1. HB 331 is not "refunding indebtedness of the State" under article IX, section 11.

Article IX, section 11 states in part that section 8's "restrictions do not apply to . . . refunding indebtedness of the State or its political subdivisions."[259] In support of its contention that this exception applies to HB 331, the State — directly contradicting its claims elsewhere that HB 331 is *not* debt — cites numerous instances

---

[257]    (...continued)
(conceding that challenged bonds "have all the earmarks of a long-term State obligation" but relenting to "inescapable conclusion" dictated by "applicable precedent"); *Hayes v. State Prop. & Bldgs. Comm'n*, 731 S.W.2d 797, 804 (Ky. 1987) (4-3 decision) (relying on need for "stability to the law" in upholding purported revenue bond supported only by "incremental taxes"). We are thus in the fortunate position of being able to learn from the missteps of other jurisdictions, in much the same way as the framers did when drafting article IX. *See supra* Part II.B.

[258]    *See, e.g.*, *Tpk. Auth. of Ky. v. Wall*, 336 S.W.2d 551, 554 (Ky. 1960) (noting that the public authority could raise tolls to satisfy bondholder claims if turnpike lease were terminated). This same reasoning underlies our approval of certain lease-purchase agreements. *See Carr-Gottstein Props. v. State*, 899 P.2d 136, 144 (Alaska 1995).

[259]    Alaska Const. art. IX, § 11.

during the committee and floor debates on HB 331 where legislators characterized the arrangement of issuing bonds to purchase outstanding tax credits as simply restructuring an existing debt.

While Section 11's exception was discussed only briefly during the Constitutional Convention, that brief description is instructive: "Section 11 . . . allows for refunding of debt by the *calling of current bonds and issuing of new ones* at lower interest rates without the referendum."[260] The Committee on Finance and Taxation's commentary also suggests that the indebtedness to be refunded would already have been contracted pursuant to a section 8 referendum.[261] This makes logical sense, as there would be no reason for a second referendum just to save taxpayer money through lower interest rates when the original debt was already approved by the voters.

So understood, this provision would be unavailable for restructuring other obligations not incurred via section 8 money-borrowing. In general, we fail to see how a tax credit — essentially a voluntary reduction in future revenue to incentivize present investment — could itself ever be the subject of refunding indebtedness under article IX, section 11. As the Delegates observed, the purpose of this limited exception was to permit the restructuring of bonds already approved by voters.

---

[260] 2 PACC 1111 (Dec. 19, 1955) (statement of Del. Barrie M. White) (emphasis added).

[261] 6 PACC App. V at 111 (Dec. 16, 1955) ("In a period when interest rates fall, a government may save large amounts of money if it can pay off its old high-rate obligations with new funds borrowed at lower rates. This process, here permitted, is called refunding, and the restrictions on the contraction of *original debt* are unnecessary; they are here made inapplicable." (emphasis added)).

## 2. HB 331 does not establish "revenue bonds" for the purposes of article IX, section 11.

The State lastly claims that the subject-to-appropriation bonds authorized by HB 331 qualify as revenue bonds under article IX, section 11. The State admits, however, that the Corporation would have no actual revenues, only the funds appropriated by the legislature. While we have previously addressed constitutional challenges to revenue bonds in *DeArmond*[262] and *Walker*,[263] in neither case did we have to determine whether the challenged bonding arrangements actually qualified as section 11 "revenue bonds."[264] We find it nevertheless significant that the legislature's sole appropriation of $150,000 in *DeArmond* was to be later reimbursed by the corporation,[265] and the association challenged in *Walker* was "expected to be self-supporting."[266] The superior court here likewise found the State's arguments dubious and summarily refuted them with statements from the Constitutional Convention.

---

[262]    376 P.2d 717, 721-25 (Alaska 1962).

[263]    416 P.2d 245, 249-53 (Alaska 1966).

[264]    *DeArmond* did not involve a challenge under our constitutional debt restrictions. 376 P.2d at 721-25 (discussing Alaska Const. art. III, § 22; *id.* art. IX, §§ 4, 6). *Walker* did include a challenge under article IX, section 8, but we did not discuss or interpret section 11. 416 P.2d at 253.

[265]    *DeArmond*, 376 P.2d at 720.

[266]    *Ault v. Alaska State Mortg. Ass'n*, 387 P.2d 698, 700 (Alaska 1963). Although this assertion only appeared in an affidavit, which we noted was defective and insufficient to support summary judgment, the affidavit was unopposed and we did not take issue with that particular statement of fact. *See id.* at 700-01 & n.5. The plaintiff was substituted after remand on *Ault*, hence the difference in case names. *Walker*, 416 P.2d at 247 n.1. The question whether the association would truly be self-supporting did not resurface in *Walker*, so we presume that fact was not seriously in dispute.

A resort to contemporaneous dictionaries reveals that the term "revenue bond" had a distinct meaning at the time of Alaska's statehood. Webster's New International Dictionary defined the term as "[a] bond issued by a public agency authorized to build or acquire a revenue-producing project and payable solely out of revenue derived from the project."[267] Ballentine's Law Dictionary likewise described "revenue bond" as being "issued by a public body payable solely from a special fund arising from the revenues accruing from operation of an enterprise or project for the construction, operation, and maintenance of which the bond was issued."[268] Delegates to the Constitutional Convention reiterated this understanding of "revenue bond," noting that the section 11 exception would be available only when "the enterprise financed by the debt will be self-sustaining."[269] The generation of rents or other revenues to repay those bonds was considered a necessity; Delegates thus pointed to public utilities as general examples,[270] including the "Eklutna project"[271] as a more specific example. The Committee on Finance and Taxation's commentary on section 11 provided similar insight.[272] The revenue bond structure insulates the State from indebtedness because the

---

[267] *Revenue Bond*, WEBSTER'S NEW INT'L DICTIONARY (2d ed. 1959).

[268] *Revenue Bond*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969).

[269] 2 PACC 1112 (Dec. 19, 1955) (statement of Del. Barrie M. White).

[270] 3 PACC 2303 (Jan. 16, 1956) (statement of Del. Leslie Nerland).

[271] 4 PACC 3422 (Jan. 28, 1956) (statement of Del. John S. Hellenthal). *See generally* Act of July 31, 1950, Pub. L. No. 628, 64 Stat. 382 (authorizing construction of the Eklutna hydroelectric generating plant).

[272] 6 PACC App. V at 111 (Dec. 16, 1955) ("When the state or its subdivisions can contract debts for special purposes (for example, to build a toll bridge) without pledging more than the improvement or the revenues from the enterprise, such debt is
(continued...)

bond is tied to a specific "self-sustaining" enterprise, such as a toll road or a public utility, so that any liability may be levied from the separate revenue stream. In contrast, HB 331 lacks any insulating wall because the bonds are not tied to any self-sustaining enterprise; bond payments would be made solely from annual legislative appropriations.

Against this backdrop, the State points to the Alaska Statehood Committee's report on state finance to argue that the framers understood revenue bonds simply as any means that "do not pledge the full faith and credit of the state."[273] But as we explained above, the framers rejected much of that report's reasoning when they adopted the restrictions against contracting debt in section 8.[274] Moreover, the constitution's plain text draws a clear and meaningful distinction between the terms "revenue" and "appropriations."[275] The presumption of consistent usage, which states that words are "presumed to bear the same meaning throughout a text,"[276] is not a canon of construction we cast aside lightly — especially when those terms appear multiple times within the same article.

---

[272]     (...continued)
permitted without referendum.").

[273]     3 CONSTITUTIONAL STUDIES, *supra* note 1, pt. IX, at 23.

[274]     *See supra* Part II.B.

[275]     *See* Alaska Const. art. IX, § 10 ("The State and its political subdivisions may borrow money to meet *appropriations* for any fiscal year in anticipation of the collection of the *revenues* for that year . . . ." (emphasis added)); *id.* § 16 ("*appropriations* of *revenue* bond proceeds" (emphasis added)).

[276]     SCALIA & GARNER, *supra* note 164, at 170; *accord Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007); 73 AM. JUR. 2D *Statutes* § 140, Westlaw (database updated May 2020).

The State nonetheless insists that "[t]he precise nature of a public corporation's 'revenues' . . . has no constitutional significance," relying heavily on the Kentucky opinion *Wilson v. Kentucky Transportation Cabinet*[277] for this proposition. But *Wilson* is unpersuasive, as the court expansively construed prior precedent to reach its outcome. *Wilson* involved a transportation bond, although the affected roads were admittedly "nonrevenue producing."[278] The court upheld the arrangement as a revenue bond by proclaiming that what matters is "the revenue produced by the payments from the biennial appropriations of the General Assembly and not the revenues which the tolls on the roads might produce."[279] The *Wilson* court cited two previous Kentucky cases also upholding transportation bonds — the first of which, *Turnpike Authority of Kentucky v. Wall*, involved revenue bonds backed by tolls and dedicated fuel taxes.[280] Biennial lease payments thus consisted of "the difference between the amount of rent agreed upon in advance and the *revenues actually produced by the project*."[281] The *Wall* court noted that if the turnpike lease were not renewed, "the right to establish and collect the *revenues* of the project passes to the Authority, . . . [and] if the *revenues* should prove insufficient to service the bonds the Authority could increase the tolls."[282] In other words, the *Wall* court never considered the lease payments to have been a source of "revenue."

---

[277]    884 S.W.2d 641, 643 (Ky. 1994) (4-1-2 decision).

[278]    *Id.* at 642-43.

[279]    *Id.* at 643.

[280]    336 S.W.2d 551, 553-54 (Ky. 1960).

[281]    *Id.* at 553 (emphasis added).

[282]    *Id.* at 554 (emphasis added).

In the other case cited by the *Wilson* court — *Blythe v. Transportation Cabinet of Kentucky* — the court disposed of constitutional claims against a financing scheme similar to that in *Wall* with very little discussion, assuming the facts were "identical to those presented" in *Wall*.[283] The *Blythe* court never indicated what sources of revenue actually backed the challenged "revenue bonds" as none had been issued.[284] The *Wilson* court then reached its conclusion on the observation that "[t]here were no tolls involved in *Blythe*, and in *Wall*, the tolls were never represented to be sufficient to pay the lease payments."[285] *Wilson*, therefore, construed *Blythe* as standing for the proposition that a dedicated revenue stream (toll roads) was not necessary — a proposition never stated in *Blythe* — paving the way to completely recast *Wall* as though it approved of legislative appropriations as an acceptable form of "revenue."[286] Regardless of *Wilson*'s questionable reasoning, one indelible difference makes Kentucky precedent unavailing here: revenue bonds are a creature of judicial creation in Kentucky,[287] whereas we are limited by our constitution.

Finally, the State argues that, because the House Finance Committee at one point rejected a proposed amendment to officially disclaim the "revenue bond" theory

---

[283] 660 S.W.2d 668, 669 (Ky. 1983) (4-3 decision). Arguably this assumption appears to have been a result of the procedural posture of appeal from judgment on the pleadings. *See id.* at 671 (Vance, J., dissenting).

[284] *Id.* at 669-70 (majority opinion).

[285] *Wilson v. Ky. Transp. Cabinet*, 884 S.W.2d 641, 643 (Ky. 1994) (citations omitted).

[286] *Id.*

[287] *Hayes v. State Prop. & Bldgs. Comm'n*, 731 S.W.2d 797, 803 (Ky. 1987); *see also Wilson*, 884 S.W.2d at 643-45 (detailing the ever-expanding definition of and evolving rationales for revenue bonds and serial leases in Kentucky).

for HB 331, it was therefore thought of as a viable rationale by legislators. That same Committee did in fact amend HB 331 by adding a provision to separately keep track of revenues from overriding royalty agreements,[288] which the Committee viewed as an attempt to leave the door open for revenue bond arguments.[289] And yet that provision in AS 44.37.230(i) is not cited once in any of the State's briefs throughout this litigation — even Committee members recognized at the time that the discretionary nature of that language would not solve "the constitutionality problem."[290] Seeing as legislators never truly believed that HB 331 created revenue bonds, to now somehow conclude otherwise would require ignoring all of this history. Granting the State's request would give to the legislature a broad power specifically withheld by the framers.[291] We hold that subject-to-appropriation bonds are not revenue bonds under

---

[288] AS 44.37.230(i) ("The department shall separately account for the revenue collected from an agreement that the department deposits in the general fund. The legislature *may appropriate* the annual estimated balance in the account to the . . . reserve fund established under AS 37.18.040." (emphasis added)); Minutes, *supra* note 114, at 15-17 (adopting Amendment 5).

[289] Minutes, *supra* note 114, at 21-24 (discussing purpose of Amendment 5 and rejecting Amendment 9, which would have disclaimed "revenue bond" theory).

[290] *Id.* at 16 (statement of Rep. Paul Seaton, Co-Chair, H. Fin. Comm.); *see also id.* (statement of Mike Barnhill, Deputy Comm'r, Dep't of Revenue) (doubting whether proposed amendment "addressed the constitutional concerns expressed to the committee"). An April 13 memorandum from the Legislative Affairs Agency analyzing HB 331 ensured that Committee members were fully aware of the potential constitutional issues beforehand. *See* Nauman, *supra* note 108, at 6-7 (contemplating "a substantial risk that . . . HB 331 will be found by a court to be unconstitutional" due to unlikelihood that contemplated bonds "could meet even the basic definition of a 'revenue bond' ").

[291] *Cf. Hickel v. Cowper*, 874 P.2d 922, 925 (Alaska 1994) ("Nor does the legislature's role in making appropriations somehow alter or increase its authority to define constitutional terms merely because the terms contain the word 'appropriation.'

(continued...)

article IX, section 11. Thus, we conclude that HB 331 violates Alaska Constitution article IX, section 8, and that no other constitutional provisions provide an exception that would validate the subject-to-appropriation bonds.[292]

### D. Severability

Having decided that the subject-to-appropriation bonds in HB 331 violate article IX, section 8, we must now determine whether any of the remaining provisions are salvageable. Laws duly enacted by the legislature are endowed with a presumption of constitutionality,[293] and even if one or more sections of a law are constitutionally infirm, AS 01.10.030 directs us to excise those portions to save the remainder if this is possible.[294] A provision is severable if "the portion remaining . . . is independent and complete in itself so that it may be presumed that the legislature would have enacted the valid parts without the invalid part."[295] However, when the invalidation of a central pillar "so undermines the structure of the Act as a whole," then "the entire Act must fall."[296]

---

[291]     (...continued)
This court retains the same power to interpret constitutional terms regardless of the subject matter of the term.").

[292]     Temporary borrowing regardless of purpose is permissible, but only if any debt is repaid before the end of the next fiscal year. Alaska Const. art. IX, § 10. The State has admitted that HB 331 does not qualify for this exception.

[293]     *State v. Schmidt*, 323 P.3d 647, 655 (Alaska 2014).

[294]     Although we have held that the general clause in AS 01.10.030 "creates an even weaker presumption" than a specific severability clause. *Lynden Transp., Inc. v. State*, 532 P.2d 700, 712 (Alaska 1975).

[295]     *Sonneman v. Hickel*, 836 P.2d 936, 941 (Alaska 1992) (citing *Jefferson v. State*, 527 P.2d 37, 41 (Alaska 1974)).

[296]     *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 633 (Alaska 1999).

Because HB 331 was specifically requested by Governor Walker, we consider his transmittal letter as a strong indication of what the bill was intended to accomplish.[297] The transmittal letter introduced HB 331 as "a bill to create a State corporation authorized to issue bonds for the purpose of purchasing oil and gas exploration tax credits."[298] Each of the four paragraphs describing the workings of HB 331 referenced "bonds" in one way or another.[299] Although HB 331 accomplishes more than just establishing a corporation for issuing subject-to-appropriation bonds — it also provides a means for negotiating overriding royalty interest agreements — even those provisions are inexorably linked to the proposed bonds.[300] Furthermore, HB 331 contains no express saving clause, and we have uncovered no indication within the legislative history that either the Governor or the legislature ever intended the other portions of HB 331 to be stand-alone provisions. Nor does the State argue for severability here. Because the subject-to-appropriation bonds are the central pillar around which other minor provisions were erected, we hold that HB 331 is unconstitutional in its entirety.

## V. CONCLUSION

HB 331 violates the limitation placed on contracting debt under article IX, section 8 of the Alaska Constitution. We REVERSE the superior court's decision granting the State's motion to dismiss based on article IX, section 8, and AFFIRM the

---

[297] *See Flisock v. State, Div. of Ret. & Benefits*, 818 P.2d 640, 645 (Alaska 1991); *State, Div. of Agric. v. Fowler*, 611 P.2d 58, 60 (Alaska 1980).

[298] 2018 House Journal 2341.

[299] *Id.* at 2342-43.

[300] *See, e.g.*, AS 44.37.230(b) ("The department may enter into an overriding royalty interest agreement . . . with an applicant that requests a purchase . . . from money . . . from the Alaska Tax Credit Certificate Bond Corporation reserve fund . . . .").

superior court's decision rejecting the State's arguments under section 11. We VACATE the award of attorney's fees and REMAND for further proceedings.